**NOT RECOMMENDED FOR FULL TEXT PUBLICATION**

File Name:  15a0579n.06

Case No. 14-2445

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 14, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| MELISSA McKENNA, | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| | ) | MICHIGAN |
| **v.** | ) | |
| | ) | |
| | ) | |
| | ) | |
| AETNA LIFE INS. CO., *et al.*, | ) | **OPINION** |
| | ) | |
| **Defendants-Appellees.** | ) | |

Before: CLAY and SUTTON, Circuit Judges; and WATSON, District Judge.[*]

**MICHAEL H. WATSON, District Judge.**  Melissa McKenna ("Appellant") appeals the judgment of the district court affirming the partial denial of long-term disability ("LTD") benefits in this case brought under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA").  For the following reasons, we **REVERSE** the judgment of the district court.

## I.    FACTS

Appellant worked for Dow Corning Corporation ("Dow Corning") as an administrative assistant in the legal department.  Aetna Life Insurance Company ("Aetna") provided group LTD coverage to Dow Corning employees.

---

[*] The Honorable Michael H. Watson, United States District Judge for the Southern District of Ohio, sitting by designation.

The plan under which Appellant was covered ("Plan") provides for disability benefits after a 180-day elimination period. The Plan employs an "own occupation" standard for the first twenty-four months of LTD benefits: benefits are available if the employee cannot perform the material duties of his or her own occupation. (AR 1169). The Plan defines both "material duties" and "own occupation," but those provisions are not at issue here, as Aetna found Appellant was unable to perform the material duties of her own occupation for a portion of the period for which she applied for benefits and, accordingly, granted Appellant LTD benefits from September 25, 2012 through February 23, 2013. We need not determine *de novo* whether her impairments prevented Appellant from performing the material duties of her own occupation during the grant period, as no party appealed that determination. Rather, our task is to determine only whether the evidence showed that Appellant remained disabled beyond February 23, 2013.

The medical evidence shows that Appellant has suffered from lower back pain for years. Specifically, a June 2010 MRI revealed a disc bulge with central protrusion at L3-L4 and L4-L5 with facet hypertrophy and mild spinal canal narrowing. (AR 970). There was no significant foraminal narrowing at L3-L4, but there was mild bilateral foraminal narrowing at L4-L5. (AR 970).

Despite these problems, Appellant continued working until March 28, 2012, when she was admitted to the hospital with a pain level of 9/10. Appellant was discharged two days later but admitted to the hospital again on April 1, 2012 due to back pain and migraines. (AR 900). Appellant reported a pain level of 8/10 with nausea and vomiting and remained in the hospital for six days. (*Id*.). During that stay, Appellant underwent additional testing, which revealed stable degenerative changes of the lumbar spine. (AR 847). Upon discharge, Appellant continued to report back pain and continued treating with her primary care physician.

Appellant then underwent additional testing to discover the cause of her symptoms. On May 11, 2012, a thoracic spine MRI revealed mild degenerative changes in the mid-thoracic spine with "posterior disk protrusions or bulging disk" and possible bony spurring with mild disc space narrowing. (AR 974, 1127–28).

On June 14, 2012, she presented to the Matrix Pain Management Clinic where she reported pain at a severity level of 6–7/10, an average and best-day level of pain at 5–6/10, and a worst-day pain level of 9–10/10. (AR 1158). She did, however, note that the pain did not limit her activities. (AR 1158). She exhibited lumbar tenderness, facet tenderness, and some painful range of motion. (AR 1159–60). Notably, the rendering provider stated that, at that time, Appellant did not exhibit radicular symptoms. (AR 1160).

In an attempt to manage the pain, Appellant received surgical injections on June 19, July 3, and July 17, 2012. (AR 1148–50). Dr. Mark Adams ("Dr. Adams"), the neurosurgeon to whom Appellant was eventually referred, later noted that these injections failed to relieve Appellant's "disabling pain." (AR 974); *see also* (AR 1141).

Appellant was referred to physical therapy on July 9, 2012 in another attempt to relieve her persistent pain. (AR 190). At Appellant's initial appointment, a physical therapy provider documented her reports of severe low back pain at a level of 7–8/10 and that her symptoms worsened with sitting and standing but improved when lying down. (AR 922).[1] Due to issues with her son's health, Appellant missed multiple physical therapy appointments; she saw little progress. (AR 283).

---

[1] The date of Appellant's initial physical therapy appointment is unclear. The appointment notes list two dates at the beginning of the document, July 23, 2012 and August 4, 2012, and each page of the notes includes a time stamp dated December 18, 2012. (AR 921–923). There is also a separate initial physical therapy evaluation dated in late September or early October of 2012. (AR 277–278).

Notes from the Matrix Pain Management Clinic in July 2012 state that by the end of that month, Appellant was still experiencing pain at a level of 7–8/10, that the injections had not provided relief, that the prescribed Morphine Sulphate and Vicodin dulled the pain but did not totally relieve it, that she still had lumbar and facet tenderness, and that she continued to need heavy pain medication. (AR 1154–56).

Appellant's primary care physician also referred her to a rheumatologist in an attempt to determine the origin of her lower back pain. (AR 1141). The notes from rheumatologist Dr. Weaver indicate that as of July 31, 2012, Appellant suffered from spasms, experienced pain on a scale of 8–9/10, and felt increased pain with standing, which was somewhat relieved when lying down. *Id.* She presented with tenderness over the low lumbar spine but had a negative straight-leg test. (AR 1143). Dr. Weaver opined that Appellant suffered from fibromyalgia or a myofascial problem with pain amplification and recommended increasing her level of physical fitness and completing physical therapy. (*Id.*).

Eventually, Appellant was referred to her neurosurgeon, Dr. Adams. Dr. Adams first examined Appellant on August 23, 2012, noting an impression of lumbar disc herniation with radiculopathy, headache, and low back pain. (AR 1145). Based on this examination, Dr. Adams completed an attending physician statement ("APS"), opining that Appellant could not return to work until after February 23, 2013. (AR 264). Dr. Adams additionally limited her to no bending, twisting, pushing, pulling, or lifting more than ten pounds based on her L3-4 and L4-5 disc collapse, annular tears, and headaches and further noted that Appellant was a possible candidate for a lumbar fusion. (AR 263–64).

In September 2012, Appellant saw Dr. Blake Bergeon, physical medicine and rehabilitation, who opined that she suffered from chronic pain syndrome. (AR 270). He

suspected myofascial pain and noted a moderate degree of degenerative disc change at L3-4 and L4-5 but did not believe the degenerative disc change would explain all of Appellant's symptoms. (*Id.*) He further stated that Appellant was developing an advanced state of deconditioning and muscle atrophy. (*Id.*)

Appellant submitted a claim for LTD benefits when the elimination period expired, and Aetna denied her claim on October 10, 2012 based on a reviewing nurse's opinion that the medical records would not support an "inability to sit, stand, walk, bend, use upper or lower extremities, etc. to perform work duties." (AR 29). Aetna explained that the medical records did not support any impairment with respect to Appellant's upper extremities and that Dr. Adams's supporting letter provided no objective medical findings to support the restrictions he placed on Appellant.

Appellant continued treatment. She saw Dr. Adams on October 22, 2012, reporting that she continued to experience back pain—which had increased since physical therapy—and that her pain medications merely dulled the pain. (AR 871). Dr. Adams's office notes from that appointment state that Appellant was severely limited by the pain, which she reported at a level four, and note the possibility of undergoing additional testing and exploring the option of surgery. (AR 873).

Appellant underwent another lumbar spine MRI on October 31, 2012, which revealed stable degenerative changes of the lumbar spine with a mild diffusely bulging disc at the T10-11 disc level and disc space narrowing, disc desiccation, and bulging discs at the L3-L4 and L4-5 disc levels. (AR 617, 974).

Dr. Adams then ordered a lumbar discogram in late November of 2012. The lumbar discogram revealed an abnormal L5-S1 and the suggestion of an abnormal disc at L4-L5. (AR

973).  He ordered a post-discogram CT scan, which revealed an annular tear or degeneration of the L3-L4 disc, a diffuse bulging disc at L3-L4, a central annular tear at L4-L5, and likely disc degeneration at L5-S1.  (AR 324, 975).[2]

On December 3, 2012, Appellant presented to Dr. Adams for a follow-up visit, reporting continued pain in her lower back and extending into her left buttocks, occasional pain in the middle of her back, and occasional numbness and tingling in her left leg that severely limited her movements.  (AR 315–316).  She reported a pain score of 4/10 and indicated that it worsened with sitting, standing, walking, and lying.  (AR 315).  Appellant had a positive straight-leg test during that visit, the strength in her lower extremities in all areas innervated by L2 through S1 was diminished, and she had a slow gait.  (AR 316).  Dr. Adams's impression included lumbar disc herniation with radiculopathy as well as lumbago and spinal stenosis in the lumbar region with neurogenic claudication.  He opined that she was "severely effected [sic] with pain that limits her activity" and may require surgery.  (AR 316–317).  Dr. Adams stated that he provided Appellant information about the surgery and planned to await her decision and follow up with her in three months—in March 2013.  (AR 317).

In March 2013, before her follow-up appointment with Dr. Adams, Appellant appealed the initial denial of LTD benefits.  (AR 318).  She submitted additional medical records, including the October and November 2013 test results.  Appellant also submitted with her appeal a statement by Dr. Adams, wherein he determined that based on Appellant's subjective symptoms and the objective tests results, as well as a positive straight-leg raise test, Appellant had functional limitations related to moving, including sitting, standing, and walking, and that

---

[2] While the record does not include documentation of the actual post-discogram CT results, a discussion of the results is found in Appellant's appeal letter to Aetna, (AR 324), and Dr. Adams's signed statement, (AR 975).

she could not lift anything greater than ten pounds. (AR 975). He further opined that Appellant could not return to work without causing further damage to her spine, including the possibility of permanent nerve damage and paralysis. (AR 975). Appellant also submitted her own statement.

While the appeal was pending, Appellant attended her follow-up appointment with Dr. Adams on March 11, 2013. The office notes from that visit state that Appellant complained of constant sharp, stabbing, and aching low back pain at a pain level of 3/10, which worsened when standing and walking and improved when sitting and lying, that her straight-leg raise was more positive on the left, that there was no muscle wasting, and that she had a steady and even gait. (AR 209–210). The impression was still lumbar disc herniation with radiculopathy, and Dr. Adams's opinion remained that Appellant was disabled with pain and may require surgery. (AR 211). He planned to follow up with Appellant in another three months. (*Id.*) Appellant submitted those notes on appeal as well.

In May 2013, Aetna approved in part and denied in part Appellant's claim. Specifically, Aetna granted benefits from September 25, 2012 through February 23, 2013. Aetna's entire explanation for denying benefits beyond February 23, 2013 is as follows:

> Our review has found that Ms. McKenna's physicain [sic] were [sic] able to provide specific abnormal examination findings up until December 2012. These findings included lumbar tenderness on palpitation, facetogenic pain, abnormal gait, painful range of motion, which cause her to be unable to sit for prolonged periods of time. Our medical review determined that with these specific abnormal findings from her treating providers, Ms. McKenna's impairments [that] were noted in Dr. Adams's note of December 3, 2012, would reasonably take take [sic] two-and-a-half months, or until February 23, 2013, for recovery. However, the records provide no evidence of significant impairment beyond this period, or as of February 24, 2013, Dr. Adams's [sic] submitted his note, dated March 11, 2013, that she had continued pain; however, she had a steady gait, and no loss of strength. It was his recommendation as of that date, that she should follow-up in another three months.

(AR 191). This determination relied on the conclusions of Aetna's file reviewer, Dr. Stuart Rubin, a physician board certified in Physical Medicine and Rehabilitation and Pain Management. (AR 189–191). Indeed, Aetna's decision essentially mirrored Dr. Rubin's report, which stated:

> Functional impairment is supported from 3/29/12 through 2/23/13[.] These functional impairments include recent hospitalization for bilateral flank pain from 4/1/12 through at least 4/5/12, lumbar tenderness, facetogenic pain, abnormal gait, painful range of motion, inability to sit for extended periods of time. Such abnormal findings are noted through 12/3/12 and it is reasonable that these findings will continue another two-and-a-half months through 2/23/13 [as] a chronic pattern has been established.
>
> Functional impairment is not supported from 2/24/13 through 5/14/13. Although it is noted in the note of 3/11/13 that the claimant had some increased back pain and she had a positive straight leg raise on the left, it is noted the claimant had a steady and even gait and it was noted the claimant had lumbar disk herniation with radiculopathy. However, it is unclear why the claimant remains disabled with pain as per the note of Dr. Adams on 3/11/13. It is unclear why the claimant is unable to work in the sedentary position from 2/24/13 through 5/14/13.

(AR 207).

Despite the determination being marked as a final decision, Dr. Adams submitted additional records to Aetna in June and July 2013. (AR 172, 178). Appellees did not change their disability determination, and Appellant eventually filed suit in the Eastern District of Michigan. Appellant alleged that Aetna and Dow Corning breached the terms of the Plan by denying her claim for LTD benefits beyond February 23, 2013. The district court affirmed the denial of benefits. (RE 4–5).

## II. STANDARD OF REVIEW

"[B]oth the district court and this court review *de novo* the plan administrator's denial of ERISA benefits, unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Wilkins v. Baptist*

*Healthcare Sys. Inc.*, 150 F.3d 609, 613 (6th Cir. 1998) (citation omitted). As neither party argues the plan administrator had discretionary authority with respect to interpretation of the Plan, we review this case *de novo*.[3]

Our role on *de novo* review is to determine whether Aetna "made a correct decision." *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir. 1990). In other words, we consider whether Aetna properly interpreted the Plan and whether Appellant was entitled to benefits under the Plan, and in doing so, we do not provide deference or a presumption of correctness to Aetna's decision. *Id.*

Our review is limited to only the administrative record as it existed when the final decision was rendered. *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 658 (6th Cir. 2013) ("[W]e 'are required to consider only the facts known to the plan administrator' at the time of the decision.") (citation omitted). Accordingly, we will consider only the information submitted before Aetna's May 28, 2013 final decision on appeal.

### III.    ANALYSIS

As explained above, Aetna ultimately approved Appellant's claim for LTD benefits from September 25, 2012 through February 23, 2013 but denied her claim for benefits for any period thereafter. Thus, our review is limited to determining, *de novo*, whether Appellant was entitled to benefits beyond February 23, 2013.

---

[3] The district court identified the *de novo* standard as the proper standard of review, but it does not appear to have applied that standard. Rather, the court appears to have treated Aetna's decision as requiring deference, analyzing primarily whether Aetna's reliance on a non-examining physician's opinion was permissible and whether Aetna provided an explanation for its disagreement with Dr. Adams's conclusion that Plaintiff was disabled. On *de novo* review, the issue is not whether the administrator was allowed to rely on a file review or whether it provided an adequate explanation for its decision. Rather, the appropriate inquiry is whether the denial of benefits was correct given the medical evidence in the record. *See Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir. 1990).

Dr. Rubin opined that Appellant's pain should resolve by that date, and Aetna relied on that opinion in its determination. Appellant argues we should give little weight to Dr. Rubin's opinion because, *inter alia*, he conducted only a file review despite the fact that Aetna retained the right to conduct a physical examination of Appellant.

As Appellant concedes, there is "nothing inherently improper with relying on a file review, even one that disagrees with the conclusions of a treating physician." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 297 n.6 (6th Cir. 2005). Rather, whether Aetna relied on a file review as opposed to a physical examination of Appellant is just one factor courts consider in determining whether a plan administrator was arbitrary and capricious and "may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Id.* at 295. While we do not apply an arbitrary and capricious standard of review in this case, we find the case law similarly applicable to our *de novo* review. *James v. Liberty Life Assurance Co. of Boston*, 582 F. App'x 581, 586 n.1 (6th Cir. 2014) (citation omitted). Accordingly, when determining whether Aetna properly denied LTD benefits beyond February 23, 2013, we will weigh Dr. Rubin's report, considering the fact that he did not conduct a physical examination, while keeping in mind that there is nothing inherently improper with relying on a file review.

Upon *de novo* review, we give little weight to Dr. Rubin's conclusion that Appellant could return to work on February 24, 2013. Dr. Rubin fails to explain the basis for his opinion that Appellant's condition and symptoms—which he agreed both prevented her from performing the material duties of her occupation and had exhibited a chronic pattern—would continue only through February 23, 2013. Based on the record, we must guess that this estimated "recovery date" came from Dr. Adams's August APS.

The APS, however, must be viewed in context. The administrative record shows Appellant was hospitalized with flank pain in March and April 2012 but that, despite numerous tests and referrals, the cause of her pain was not initially established. Instead, Appellant was simply attempting to manage the pain with the use of heavy narcotics. It was during this period, however, when Dr. Adams, just after his initial consultation with Appellant, submitted the APS in which he opined that she would be able to return to work on February 24, 2013. Dr. Adams did not know the etiology of Appellant's pain at that time, and, moreover, Dr. Adams provided no explanation for *his* initial opinion that Appellant would be able to return to work on February 24, 2013.

The medical evidence shows that it was not until October and November 2012, months after Dr. Adams initially opined Appellant would recover by February 23, 2013, that an MRI, discogram, and post-discogram CT scan showed that Appellant had: a diffuse bulging disc at T10-11, disc space narrowing and disc desiccation at both the L3-4 and L4-5 discs with bulging discs at both levels, abnormal discs at L4-5 and L5-S1, an annular tear or degeneration of the L3-L4 disc, a central annular tear at L4-L5, compression of the thecal sac, and disc degeneration of L5-S1. (AR 973–75). After those tests, Dr. Adams opined that Appellant was "severely affected with pain," still had lumbar disc herniation with radiculopathy, that she would ultimately require a posterior lumbar intervertebral fusion due to her collapsed discs with annular tears, and that a return to work could cause permanent nerve damage or paralysis. (AR 975). Never after August 2012 did Dr. Adams opine that Appellant would be able to return to work as of February 24, 2013. Indeed, at both of her follow-up appointments in December 2012 and March 2013, Dr. Adams noted that although no new tests were performed, Appellant still had a positive straight-

11

leg test, and at both visits he opined that Appellant was still disabled with pain and could require surgery. (AR 210–11, 316–17).

Reviewing the evidence in context, we conclude that a fair reading of the administrative record is that Dr. Adams's initial opinion about Appellant's return to work date was just that—an initial opinion. For this reason, and because Dr. Rubin neither conducted his own physical examination of Appellant nor offered any other explanation as to why he believed Appellant's condition and symptoms would continue only through February 23, 2013, we give little weight to his opinion that her abnormal findings would be expected to continue only through that date. Instead, we look at the entire administrative record to determine whether there was any indication of abnormal findings or continued disability beyond February 23, 2013.

Upon review of the record, we find there is sufficient evidence that her impairment continued beyond February 23, 2013. First, we note that Aetna's partial finding of disability was based on abnormal examination findings up through December 2012, including lumbar tenderness on palpitation, facetogenic pain, abnormal gait, and painful range of motion, which caused Appellant to be unable to sit for prolonged periods of time. With the exception of the observation that Appellant had a steady gait on March 11, 2013, there is no evidence that any of these abnormal findings improved by February 24, 2013. Second, there is certainly no objective evidence of improvement of any of the bulging discs, collapsed discs, or annular tears that were noted in the October MRI and November discogram. Third, there is no record evidence of successful treatment, sustained pain relief, or even an examining physician opinion that her condition had improved or that she no longer suffered from functional limitations. As such, there is simply no record evidence suggesting that Appellant's "chronic" condition did not continue beyond February 23, 2013.

To the contrary, the available evidence suggests that such abnormal findings persisted beyond that date. As of March 11, 2013, Appellant still had lower back pain, lumbar spasms, a positive straight-leg test, and reduced range of motion. (AR 209–10). Surgery was still a possibility. (AR 210). Even Dr. Rubin admitted Appellant's condition was "chronic," and the two most recent opinions from her treating neurosurgeon were that she continued to remain disabled with pain into March of 2013 and that a return to work could cause permanent nerve damage or paralysis. (AR 211, 975).

We find the fact that Appellant exhibited a steady gait and decreased pain at one appointment does not, when viewed in context, outweigh the rest of the medical evidence, which suggests that Appellant was no better off after February 23, 2013 than she was on or prior to that date, when Aetna agreed she was prevented from performing the duties of her own occupation.

In sum, although it is Appellant's burden to prove that she was entitled to LTD benefits, she unquestionably met that burden when she proved to Aetna's satisfaction that her condition resulted in functional impairments that prevented her from performing the material duties of her own occupation through February 23, 2013. Appellees fail to explain how one office note documenting a steady and even gait and decreased pain level overcomes the remaining evidence and the treating physician's opinion, indicating that Appellant remained disabled beyond that date. For this reason, we reverse the decision of the district court and remand to Aetna to determine the scope of Appellant's entitlement to benefits beyond February 23, 2013.[4]

---

[4]Appellant also asserts that Aetna's peer review physician was inherently biased. Appellant Br. 3. We do not consider this issue, however, as Appellant did not raise it before the district court. *See Sigmon Fuel Co. v. Tennessee Valley Auth.*, 754 F.2d 162, 164–65 (6th Cir. 1985). Additionally, we note that although Appellant listed the district court's order granting Appellee's motion to strike in her Notice of Appeal, she has since abandoned any challenge to that order by failing to address it in her initial brief on appeal. *See Perkins v. Twp. of Clayton*, 411 F. App'x 810, 816–817 (6th Cir. 2011).

## IV.    CONCLUSION

For the foregoing reasons, the decision of the district court is **REVERSED**.