**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,**
**Plaintiff,**

v.

**TEPRO, INC., Defendant.**

**Case No. 4:12–cv–75.**

United States District Court,
E.D. Tennessee,
at Winchester Division.

Signed Sept. 28, 2015.

Anica C. Jones, Gerald L. Thornton, Kelley R. Thomas, Equal Employment Opportunity Commission, Nashville, TN, Faye A. Williams, Markeisha Katera Savage, Matthew H. McCoy, United States of America, Memphis, TN, for Plaintiff.

Marcia Dawn McShane, Mary Dohner Smith, Constange, Brooks & Smith, William A. Blue, Jr., Constangy, Brooks & Smith, Nashville, TN, Tamula R. Yelling, Constangy, Brooks & Smith, LLP, Birmingham, AL, Timothy R. Newton, Constangy, Brooks & Smith, Atlanta, GA, for Defendant.

## *ORDER*

HARRY S. MATTICE, JR., District Judge.

Before the Court are Defendant's Motion in Limine to Preclude the Expert Testimony of Dr. Richard Tonowski (Doc. 102) and Plaintiff's Motion in Limine to Preclude the Expert Report and Opinion Testimony of Dr. David Griffin (Doc. 110). For the reasons discussed herein, the

Court will **DENY** Defendant's Motion (Doc. 102) and will **GRANT IN PART** and **DENY IN PART** Plaintiff's Motion (Doc. 110).

Also before the Court is Defendant's Motion for Summary Judgment. (Doc. 93). For the reasons discussed herein, the Court will **DENY** Defendants' Motion. (Doc. 93). Finally, Defendant's Motion for Sanctions (Doc. 95) will be **DENIED.**

## I. MOTIONS IN LIMINE

### A. Background

On November 15, 2012, the EEOC filed this Age Discrimination in Employment Act ("ADEA") action against Defendant Tepro, Inc. on behalf of a class of 25 former Tepro employees. (Doc. 1; *see* Doc. 105–2). The Complaint alleges that, in January or February 2009, Tepro began reclassifying employees in the protected age group—that is, those over the age of 40—from "Tech II" to "Tech III" positions—sometimes through the use of false statements, coercion, or threats—and that this reclassification resulted in the reclassified employees losing their seniority dates and ultimately being laid off.[1] The Complaint further alleges that, by the end of June 2009, more than 25 employees in the protected age group who had been reclassified as Tech III, as well as other Tech III employees in the protected age group, had been laid off. No employees outside of the protected age group were subject to the reclassification or lay off.

This case involves claims for disparate treatment in violation of the ADEA—spe-cifically, that Tepro engaged in a discriminatory workforce reduction.[2] Both parties have offered statistical experts to offer opinions regarding Tepro's employee reclassification efforts and reduction in force ("RIF"); each has now moved to have the other's expert precluded from testifying as an expert. (*See* Docs. 102, 110).

In the Sixth Circuit, when a workforce reduction is a factor in the decision to terminate, a plaintiff cannot establish its *prima facie* case "absent additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir.1990); *see also, e.g., Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536–37 (6th Cir.2014); *Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121, 1126 (6th Cir.1998) (noting that the typical fourth prong of the *prima facie* case—that the employee was replaced by someone outside the protected class or that similarly situated employees outside the protected class were treated more favorably—is supplanted in workforce reduction cases). "Appropriate statistical data showing an employer's pattern of conduct toward a protected class as a group can, if unrebutted, create an inference that a defendant discriminated against individual members of the class" if the statistics "show a significant disparity and eliminate the most common nondiscriminatory explanations for the disparity." *Barnes*, 896 F.2d at 1466. Thus, statistical evidence regarding Defendant

---

1. The distinctions between Tech II and Tech III positions will be discussed in more detail *infra* in the Court's discussion of Defendant's pending Motion for Summary Judgment; however, the primary distinction is that Tech II employees performed all of the work that Tech III employees performed but additionally performed the more skilled task of molding, and were therefore paid a higher rate than Tech III employees.

2. Tepro denies any wrongdoing or discriminatory acts. (*See* Doc. 3). It maintains that employees were given the choice to be reclassified, or to remain Tech II employees with additional responsibilities, and that it subsequently conducted a valid and non-discriminatory reduction in its workforce.

Tepro's workforce may be relevant evidence for Plaintiff to prove its *prima facie* case of discrimination as to these former Tepro employees.

The parties presented argument at a hearing on their Motions on February 27, 2015. (Doc. 129). Both parties subsequently filed supplemental briefs with respect to Dr. Tonowski. (Docs. 131, 132). The parties' evidentiary Motions are now ripe for the Court's review.

## B. Legal Standards

█ Each party seeks to exclude the expert testimony and/or reports of its opponent's expert witness.[3] The proponent of the expert evidence has the burden of establishing that the evidence is admissible. *See* Fed.R.Evid. 104(a); *Donathan v. Orthopaedic & Sports Med. Clinic, PLLC*, 2009 WL 3584263, at *20 (E.D.Tenn. Oct. 26, 2009). Such evidence is governed by Federal Rule of Evidence 702, which provides that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Fed. R.Evid. 702; *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (noting that an expert is different from a lay witness and is accordingly "permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."). Additionally, under Rule 403, the Court has the authority to exclude any

evidence as to which the "probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."

An expert's testimony may be admissible under Rule 702 if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702.

█ The Supreme Court has clarified the language and scope of Rule 702, as well as the role of the district court in assessing the admissibility of expert testimony. In *Daubert*, the Supreme Court held that Rule 702 imposes an obligation upon district court judges to serve as "gatekeepers," who "ensure that any and all scientific testimony . . . is not only relevant, but reliable." 509 U.S. at 589, 113 S.Ct. 2786. It noted that "[t]he subject of an expert's testimony must be 'scientific . . . knowledge,'" clarifying that "[t]he adjective 'scientific' implies a grounding in the methods and procedures of science," and that "the word 'knowledge' connotes

---

3. There appears to be a factual dispute between the parties as to whether Tepro followed its own policies when conducting the RIF, as they eliminated employees based on seniority within a certain position, rather than overall seniority with the company. Both experts discuss the seniority issue with regard to the RIF, with Tonowski opining that the average age of Tepro's workforce decreased, rather than increased, after its reduction in force, which is not an expected result for an RIF based on seniority with the employer. Griffin responds that Tonowski's

opinion to this effect is invalid as it did not account for tenure within a specific job classification. This factual dispute is not appropriately considered by the Court in considering the instant issues—that is, admissibility of these expert witnesses under *Daubert*. However, the Court notes that, because a factual dispute exists with regard to the basis for Tepro's RIF decision, the Court will likely allow the experts to testify with regard to any findings of statistical significance related to the possible bases for that decision.

more than subjective belief or unsupported speculation." *Id.* at 589–90, 113 S.Ct. 2786.

■ The Court in *Daubert* noted that the relevance standard was "a liberal one" as defined in Rule 401. *Id.* at 587, 113 S.Ct. 2786 ("Relevant evidence is defined as that which has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.") (internal quotation marks omitted). The relevance consideration has been described as the "fit" requirement of *Daubert*—that is, the expert must "fit" the facts of the case into the principles and methodologies used to render his opinion. *United States v. Smithers,* 212 F.3d 306, 313, 325–26 (2000); *see also, e.g., Galloway v. Big G. Exp., Inc.,* 590 F.Supp.2d 989, 997 (E.D.Tenn. 2008) (finding methodology used by expert to be "sufficiently similar" to the facts of the case at hand to allow the expert's opinion, noting that "[a]ny weaknesses in such an opinion caused by the differences ... may be addressed through cross-examination."); *Zuzula v. ABB Power T & D Co., Inc.,* 267 F.Supp.2d 703, 711 (E.D.Mich.2003) (noting that *Daubert* and Rule 702 require "that an expert's opinion be based on a foundation grounded in the actual facts of the case, that the opinion is valid according to the discipline that furnished the base of special knowledge, and that the expert appropriately 'fits' the facts of the case into the theories and methods he or she espouses."); *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 152, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (noting that an expert's testimony may be inadmissible if it does not "fit the facts" of the case).

■ The *Daubert* Court also refined the reliability standard, noting that all scientific testimony or evidence must have a reliable "foundation" or "basis in knowledge and experience in [the expert's] discipline."

*Id.* at 592, 597, 113 S.Ct. 2786. The Court explained that, in assessing admissibility under these standards, courts should focus "solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595, 113 S.Ct. 2786; *see also Tamraz v. Lincoln Elec. Co.,* 620 F.3d 665, 675 (6th Cir.2010) ("The important thing is not that experts reach the right conclusion, but that they reach it via a sound methodology"); *Best v. Lowe's Home Ctrs., Inc.,* 563 F.3d 171, 176–77 (6th Cir.2009) ("Daubert attempts to strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other."). Nonetheless, the Court is not required "to admit opinion evidence ... if "there is simply too great an analytical gap between the data and the opinion proffered." " *Joiner,* 522 U.S. at 146, 118 S.Ct. 512.

■ Thus, when faced with a *Daubert* challenge, this Court must first make a threshold determination as to whether the expert is testifying as to scientific knowledge and that such knowledge will assist the trier of fact. Following this determination, the Court must assess the additional factors set forth in *Daubert* to determine whether the expert testimony or evidence is sufficiently reliable to be admitted. These factors include:

1) whether the expert's scientific technique or theory can be, or has been, tested; 2) whether the technique or theory has been subject to peer review and publication; 3) the known or potential rate of error of the technique or theory when applied; 4) the existence and maintenance of standards and controls; and 5) whether the technique or theory has been generally accepted in the scientific community.

*United States v. Beverly,* 369 F.3d 516, 528 (6th Cir.2004) (citing *Daubert,* 509 U.S. at

592–95, 113 S.Ct. 2786); *but cf. Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (noting that reliability standards set forth in Daubert are "flexible" and that the listed "factors neither necessarily nor exclusively applies to all experts or in every case."); *see also In re Countrywide Fin. Corp. Mortgage–Backed Sec. Litig.,* 984 F.Supp.2d 1021, 1036 (C.D.Cal.2013) ("The *Daubert* standard does not exist to ensure that only the most ideal scientific evidence is admissible in court proceedings, but instead to ensure that expert testimony is derived by the scientific method.") (internal quotation omitted). Additionally, the United States Court of Appeals for the Sixth Circuit has held that district courts should consider whether the "expert testimony [was] prepared solely for purposes of litigation, as opposed to testimony flowing naturally from an expert's line of scientific research or technical work." *Johnson v. Manitowoc Boom Trucks, Inc.,* 484 F.3d 426, 434 (6th Cir.2007) (noting that testimony prepared solely for litigation should be "viewed with some caution").

 In making these determinations, the district court may not weigh the evidence; instead, as the gatekeeper, the district court's authority is limited to determining the admissibility of the expert evidence. *United States v. Stafford,* 721 F.3d 380, 394 (6th Cir.2013). District courts have "considerable leeway" in making admissibility determinations regarding expert testimony. *Baker v. Chevron U.S.A. Inc.,* 533 Fed.Appx. 509, 520 (6th Cir.2013); *Tamraz,* 620 F.3d at 672 (noting that district courts have broad discretion over the admissibility of expert testimony because "where one person sees speculation ... another may see knowledge.").

 However, as a general matter, "rejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal Antitrust Litig.,* 527 F.3d 517, 530 (6th Cir.2008). If the expert evidence and/or testimony are not excluded, there are many tools a party seeking to discredit evidence may utilize, such as "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786. Furthermore, if the evidence is deemed admissible by a court but is ultimately found "insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment." *Id.; see* Fed.R.Civ.P. 50.

**C. Defendant's Motion to Exclude the Testimony of Dr. Tonowski**

The EEOC has designated Dr. Richard Tonowski as an expert to testify regarding alleged statistical disparities in Tepro's workforce before and after its layoffs; specifically, Tonowski opines that age-related statistical disparities exist in Tepro's workforce before and after its reduction in force. Tonowski's initial report and opinion includes six "exhibits," which show the statistical data he used and the statistical analyses that he performed.[4] (Doc. 103–1). Specifically, Tonowski examined data contained in spreadsheets produced by Tepro during discovery in this case. (*Id.*). He opines that the results of Tepro's RIF did not meet the general expectation for an RIF based on overall seniority—that is, time of employment with the organization—as the average age of Tepro's workforce decreased, rather than increased, following its RIF. (*Id.* at 5–6). He also opines that older employees were overre-

---

4. While Tonowski identifies his exhibits separately, his conclusions overlap and/or are based on his cumulative analysis.

presented at statistically significant levels in the reclassification efforts, as well as the RIF; his analysis shows a less than 1 in 10,000 chance that the significant difference in the age of employees who were reclassified versus those who were not reclassified was the result of chance alone. (*Id.* at 7–10).

Defendant Tepro has moved to exclude Tonowski's testimony pursuant to both Rules 104 and 702 of the Federal Rules of Evidence. (Doc. 102). In its Motion and accompanying memoranda, Defendant attacks Tonowski's opinions in numerous ways. The Court notes as an initial matter that the parties have not disputed that Tonowski is a qualified expert and that he is testifying as to a matter of scientific knowledge—that is, statistics. Indeed, Defendant concedes that the general principles and methods used by Tonowski are valid. (*See* Doc. 111). Instead, Defendant Tepro disputes the relevance and/or reliability of Tonowski's expert opinions and exhibits.

### 1. Disparate Impact

■ Defendant first argues that Tonowski's opinions do not assist the trier of fact in understanding the evidence or determining any fact at issue to the extent that they support or discuss a disparate impact claim. (Doc. 103 at 9–10). Specifically, it argues that the EEOC's Complaint fails to include a disparate impact claim and that Tonowski's report and testimony are thus irrelevant to the extent that he discusses and analyzes the impact of Tepro's reclassification efforts and layoffs. (*Id.* at 10–11). It notes that Tonowski testified that the type of theory pursued by the EEOC did not play a role in his analysis and argues that he inappropriately "alternates" between analyses that are relevant to disparate impact claims and those that are not. (*Id.*). In Response, the EEOC argues that Tonowski is a qualified statistical expert, whose testimony is admissible to show Tepro's pattern of discriminatory conduct against employees over the age of 40, thus establishing Plaintiff's *prima facie* case of disparate treatment on the basis of age. (Doc. 108 at 1, 5). At the *Daubert* hearing in this matter, the EEOC clarified that it has not sought to pursue a disparate impact claim and that it has no intention of doing so in the future. Nonetheless, it argues that no precedent supports Tepro's argument that different types of statistical analysis or evidence are required for disparate treatment claims and disparate impact claims. (Doc. 108 at 13–14).

■ As to this point, the Court agrees with the Plaintiff and finds that Tonowski's opinions about the impact of the reclassifications and RIF are admissible. "While '[f]unctionally the disparate treatment and disparate impact models have different aims,' the same statistical evidence is often relevant to both disparate treatment pattern and practice claims and disparate impact claims." *Moore v. Napolitano*, 926 F.Supp.2d 8, 18–19 (D.D.C.2013) (quoting *Segar v. Smith*, 738 F.2d 1249, 1266–67 (D.C.Cir.1984)); *see also Siegel v. Inverness Med. Innovations, Inc.*, 2010 WL 1957464, at *3 (N.D.Ohio May 14, 2010) (finding that disparate impact statistics were relevant to an analysis of Plaintiff's *prima facie* case of disparate treatment); *Barnes*, 896 F.2d at 1466 (applying disparate impact statistics to find that the plaintiff had proven a *prima facie* case of disparate treatment); *Laugesen v. Anaconda Co.*, 510 F.2d 307, 317 (6th Cir.1975) (finding that statistics regarding employer's retention and termination of employees by age were relevant in an individual discrimination case, and noting that the plaintiff's arguments against those statistics "go mostly to the weight to be accorded them, an issue for the jury"). Thus, while the EEOC has not pursued a disparate impact

claim, statistical evidence regarding the impact of Tepro's reclassification efforts and RIF on older employees may still be relevant to the issue of whether "the employer singled out the plaintiff for discharge for impermissible reasons," which is an essential element of Plaintiff's *prima facie* case. *See Barnes*, 896 F.2d at 1465. Thus, Defendant's Motion to Exclude Tonowski's testimony and opinions will be **DENIED** with respect to this argument.

### 2. *Exhibits & Opinions*

 Next, Tepro argues that the opinions contained in Tonowski's initial report are unreliable and irrelevant. Defendant challenges each of Tonowski's "exhibits"— that is, each of his individual statistical analyses—separately. As to Exhibit 1, it argues that: (1) he failed to use the correct population of employees when conducting his analysis, by using Tepro's entire workforce from 2008 through 2010, as opposed to only Tech III employees who were subsequently reclassified to Tech II status and as opposed to the population of employees only for the time periods relevant to the reclassification and RIF in 2009; (2) Tonowski made arbitrary assumptions regarding "expectations" for a reduction in force, rather than relying upon any actual facts of this case; (3) his analysis "is unreliable because analysis of the correct population and facts undermines the EEOC's theory of the case"— specifically, that a comparison of the average ages of the Tech II and Tech III employees after reclassification and RIF show no significant age disparity; and (4) he failed to account for employees who voluntarily resigned or retired, or those who were terminated for reasons other than the RIF. (Doc. 103 at 11–16). Tepro further argues that Tonowski's opinions contained in Exhibits 2 and 3 are not relevant because his analysis fails to consider the factors of employee choice regarding reclassification or nondiscrimina-

tory explanations for any disparities, such as the differences in job duties between classifications and the physical abilities of various employees. (*Id.* at 16–19). Tepro also argues that Tonowski's opinions in Exhibit 4 are inadmissible as they are not based on statistical analysis and reference "misleading" data. (*Id.* at 19–20). Specifically, Tepro argues that Tonowski has repeatedly "grouped" the reclassification and the RIF decisions together in conducting his analysis and has failed to analyze the percentage of employees in the Tech II and Tech III positions over the age of 40 before and after the relevant decision times. (*Id.* at 20–22). As to Exhibits 5 and 6, Tepro argues that Tonowski's opinions and analysis are subject to the same relevance objections as his other exhibits, as he again used the wrong pool of data, the wrong dates, and failed to account for other factors impacting the reclassification and RIF. (*Id.* at 20–23).

Plaintiff responds that Tonowski's statistical analysis is relevant because it shows significant age disparities associated with Tepro's reclassification efforts and RIF and eliminates random chance as an explanation. (Doc. 108 at 11–12). Plaintiff argues that Tonowski used a proper employee population and accepted scientific analysis to reach his conclusions, and that all of his exhibits are relevant to Plaintiff's claims. It argues that Defendant is, in essence, attacking only Tonowski's conclusions, rather than his methodology, and is seeking to exclude Tonowski's testimony because it does not fit within Defendant's version of the facts and theories of the case. Plaintiff further notes that factual disputes exist regarding the basis for seniority used for the RIF and regarding the voluntariness of the reclassification. (*Id.* at 12–18). The EEOC contends that Tepro's arguments "at best, relate[ ] to the weight that should be afforded to Dr. Tonowski's

testimony, not to its admissibility." (*Id.* at 1).

As to Tonowski's specific exhibits, Plaintiff argues that Exhibit 1 is relevant and probative as to whether Tepro singled employees out based on age, given that Tonowski has found a statistical correlation between age and seniority and that seniority played a crucial role in Tepro's RIF. (Doc. 108 at 14–15). Plaintiff argues that it was not improper for Tonowski to use the employer's entire workforce as the population for his statistical analysis based on binding precedent from this Circuit and that he did not make any improper assumptions about hypothetical RIFs, but rather based his conclusion on proper correlation principles. (*Id.* at 15–17). It further argues that Exhibits 2 through 6 are relevant, as they (1) demonstrate that older employees were overrepresented in both the reclassification and the RIF; (2) further eliminate the possibility of the disparities being the result of random chance; and (3) demonstrate that every employee subjected to the RIF was over the age of 40. (*Id.* at 17–25).

The Court finds that Tonowski's analysis and opinions—individually and as a whole—are admissible under *Daubert.* Tonowski examined data contained in spreadsheets produced by Tepro during discovery in this case.[5] Tonowski's analysis shows that the mean age of Tepro's workforce declined after the RIF and that the maximum aged employee also declined. Based on his knowledge of statistical correlation, Tonowski opines that the data following Tepro's RIF does not comport with the data that would be present after an RIF based on seniority—that is, time with the organization.[6] He also opines that older employees were overrepresented at statistically significant levels in the reclassification efforts, as well as the RIF; his analysis shows a less than 1 in 10,000 chance that the significant difference in the age of employees who were reclassified versus those who were not reclassified was the result of chance alone.

Such opinions are relevant to the issue of whether a pattern of behavior by Tepro existed that would allow the fact finder to draw an inference that Plaintiff's class of employees was targeted or singled out based on age. Specifically, his opinions are relevant to the factfinder's consideration of whether Tepro created and implemented a systematic scheme of reclassifying older workers in order to justify terminating them through an eventual RIF. Tonowski's statistical analysis and correlating conclusions that older employees were overrepresented in the reclassification efforts and RIF are relevant to whether the members of the Plaintiff class are entitled to an inference of age discrimination. Tonowski's opinions and analysis are certainly relevant to the factual and legal issues at issue in this case under the "liberal" standard of *Daubert,* and the Court finds them to be reliably

---

5. The Court agrees with Plaintiff that *Barnes* expressly contemplates the relevance of statistical analysis across an entire company in a reduction in force case and thus finds that Tonowski's opinions were not based on an overly broad employee data pool. *See Barnes,* 896 F.2d at 1467–68. Defendant's remaining qualms regarding Tonowski's data go more to the weight of Tonowski's testimony and are thus more appropriately dealt with through cross examination at trial.

6. As previously noted, there appears to be a factual dispute between the parties as to whether Tepro followed its own policies when conducting the RIF, as they eliminated employees based on seniority within a certain position, rather than overall seniority with a company. This factual dispute is not appropriately considered by the Court in considering the instant issue—that is, the relevance and reliability of Tonowski's expert opinions and exhibits.

reached based on scientific standards and generally accepted statistical standards.

■ Defendant's arguments for exclusion do not, at their core, relate to the relevance or reliability of Tonowski's expert statistical opinions and analysis. Defendant's arguments are flawed in that an expert's opinion does not become irrelevant or unreliable simply because it fails to account for Defendant's theory of the case. Instead, such arguments go to the weight and significance of those opinions, which is a factual matter for the jury to decide; Defendant remains free to challenge Tonowski's statistical conclusions at trial, and it remains free to present other explanations for any disparities. The Court simply does not find Tonowski's statistical analysis and related opinions to be so lacking in relevance or reliability as to render it the "exception to the rule" for exclusion of expert testimony. Accordingly, Defendant's Motion to exclude Tonowski's expert testimony and reports (Doc. 102) will be **DENIED**.

### D. Plaintiff's Motion to Exclude the Affidavit and Opinion Testimony of Dr. Griffin

■ Tepro designated Dr. David Griffin as an expert to testify in response to Dr. Tonowski's opinions. According to Griffin, he was asked by Tepro to review Tonowski's report and its underlying materials and offer an opinion as to whether the

"various studies described in that report answer two simple questions: (1) were age-protected employees in the Tech–II job statistically significantly more likely than their younger counterparts to have been reclassified to the Tech–III job in January/February 2009?; and (2) were age-protected employees in the Tech–II and Tech–III jobs statistically significantly more likely than their younger counterparts to have been designated for layoff?" (Doc. 111–8 at 2).

Griffin has submitted an affidavit contending that Tonowski's report answers neither question.[7] Specifically, Griffin opines that Tonowski's opinions and analysis are not relevant to this ADEA suit because he does not compare reclassification or layoffs "between the age-protected and non-protected employee groups"—that is, employees under and over 40 years of age. (*Id.* at 2–3, 7–8, 10–12). He argues that, if such analysis had been performed, it would have resulted in no significant disparity between older and younger employees using the "4/5s" or "80% Rule." (*Id.* at 9, 12–14). Griffin contends that "age sub-group" analysis is not probative in ADEA cases because the data can be "mined" "in order to determine the particular point in the age distribution which maximizes the adverse disparity" between "older" and "younger" "employees." (*Id.* at 4). He also offers several "hypotheticals" to demonstrate why average age comparisons are "unsuitable" for consider-

---

7. Griffin also discusses at length the difference between disparate impact and disparate treatment claims and asserts that "statistical comparisons must be limited to 'similarly-situated' employees" in disparate treatment claims. (Doc. 111–8 at 6). As previously addressed, the Court finds that disparate impact "statistics" may be useful and relevant in assessing the merits of disparate treatment claims. Griffin's statement of what statistical evidence may or must be considered in disparate treatment cases is a legal conclusion, rather than an expert opinion, and thus car-

ries no weight in this matter. Furthermore, the Court finds no precedent supporting Griffin's legal conclusion that the statistical evidence presented in the fourth prong of a plaintiff's *prima facie* case of disparate treatment in an RIF may only relate to similarly situated employees. Quite to the contrary, the United States Court of Appeals for the Sixth Circuit held in *Barnes* that "all employees who could have been considered by the management personnel involved in the decision" may be relevant comparators in an RIF case. *Barnes,* 896 F.2d at 1468.

ation in ADEA cases. (*Id.* at 4–5). Griffin opines that Tonowski's exhibits which include employees from numerous job classifications are of no relevance to the claims at issue. (*Id.* at 7). He argues throughout that Tonowski erred in not considering voluntary choice as a factor in the reclassification. (*See generally id.*).

Plaintiff has moved to preclude Griffin's testimony pursuant to Fed.R.Evid. 402, 403 and 702. (Doc. 110). Specifically, the EEOC contends that Griffin: (1) opines on disparate impact and the adverse impact ratio, which are not at issue in this disparate treatment case; (2) provides opinion statements that are contrary to Sixth Circuit case law; (3) opines on legal issues and engages in legal analysis; (4) attempts to resolve factual disputes; and (5) provides opinions that are speculative and lack the rigor required of an expert statistician, as he used no scientific methods or procedures to reach his conclusion, did not conduct any independent statistical analysis, and did not explain how his experience led him to his specific conclusions. (Doc. 111).

In Response, Tepro argues that, as a rebuttal expert, Griffin has no responsibility or requirement to perform independent statistical analysis. (Doc. 119). It argues that Griffin's testimony is admissible and relevant to rebut Tonowski's testimony and explain the flaws in Tonowski's analysis. (*Id.*).

■■■ Rebuttal experts can properly "respond[ ] to the content of [the original] expert witness' report and opinions." *Express Energy Servs. Operating, L.P. v. Hall Drilling, LLC*, 2015 WL 3743795, at *3 (E.D.Ohio June 15, 2015). However, rebuttal experts "cannot exceed the scope of simply responding" to the original expert's testimony and opinions. *Id.; see* Fed.R.Civ.P. 26(a)(2)(D)(ii) (setting disclosure deadline for expert whose "evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party"); *see also Campos v. MTD Prods., Inc.*, 2009 WL 2252257, at *10 (M.D.Tenn. July 24, 2009) (excluding plaintiff's rebuttal expert, in part, because his "rebuttal" was "simply an initial expert report" that did not specifically rebut information from the defense expert but rather, responded generally to the allegations of the defense).

The Court agrees with Tepro that Griffin is not required to conduct independent statistical analysis in his role as a rebuttal expert. Instead, Griffin's rebuttal may properly respond to the scope of Tonowski's original expert opinion and reports. As a general proposition, the Court believes that Griffin's testimony is reliable and relevant to the issues in this action, and specifically, to the weight and credibility of Tonowski's expert statistical analysis and opinions.

The Court, however, believes that portions of Griffin's report may exceed the scope of simply responding to Tonowski's expert opinions. Specifically, the Court takes issue with Griffin's use of "hypothetical" layoff scenarios as a means of challenging Tonowski's analysis and opinions. Additionally, any testimony or opinions regarding a disparate impact claim are nonresponsive to Tonowski's expert report, as no such claim was discussed or analyzed therein (and indeed, no such claim exists in this action).[8] Nonetheless, the Court finds

---

8. Griffin conceded in his deposition that his conclusions regarding the relevant age comparison groups and the adverse impact ratio were made with respect to a disparate impact theory, and that such opinions would not apply in the disparate treatment context. (*See*

*generally* Doc. 125–6). Thus, while the Court will allow Griffin's rebuttal testimony, the scope of such testimony may be substantially limited in light of the Court's conclusions in this instant Order.

that exclusion of Griffin's testimony is unwarranted; Griffin is a qualified rebuttal expert who will be permitted to testify in response to Tonowski's expert testimony, and any matters regarding the arguably excessive scope of Griffin's rebuttal testimony can be adequately dealt with at trial through objections and rigorous cross-examination.

Notwithstanding the admissibility of Griffin's rebuttal testimony, Plaintiff correctly notes that there are numerous flaws in Griffin's affidavit. First, Griffin bases his attack on Tonowski's statistical analysis in large part based on an assumption that Tepro's version of the facts of this action is true or undisputed.[9] Dr. Griffin also unequivocally states that it is "a fact," and not simply his opinion, that Tonowski's report does not demonstrate any statistical significance in age disparities for the reclassification and RIF. Additionally, Dr. Griffin's report contains several conclusory statements of "fact" regarding disputed issues in this litigation (i.e., stating that "[e]mployees electing the reclassification option did so *voluntarily*," when Plaintiff has challenged the voluntariness of the reclassification by alleging that employees were threatened or coerced into reclassification), although he concedes in his deposition that he has no independent knowledge of such facts. Further, Dr. Griffin frequently discusses legal standards, setting forth statements of law and concluding

that Dr. Tonowski's report and opinions do not comply with those legal standards. He even concedes in his deposition that his report, at times, offers "lay" opinions. Dr. Griffin's report also contains numerous statements that cannot be classified as "expert" opinion and that appear to merely be an effort to insult and/or undermine Plaintiff and its expert (i.e., stating that "Dr. Tonowski and the EEOC should know better" and that certain conclusions of Tonowski's are "misplaced if not disingenuous").

Griffin may provide contrasting expert opinions to those provided by Tonowski, which account for additional factors that may have impacted Tepro's decision making or affected the reliability of Tonowski's analysis and conclusions. He may challenge the methodology utilized by Tonowski in reaching his conclusions. He may not, however, testify as to the truth of any factual matter. He also may not testify as to any legal standards or conclusions, as it is the sole province of the Court to instruct the jury on the state of the law.[10] The Court also will not permit Griffin to offer non-expert opinions such as those identified above as potentially inflammatory. Such statements are not relevant to the jury's consideration of the facts and would simply serve to prejudice the jury against Plaintiff and Dr. Tonowski. Accordingly, while the Court finds no basis upon which to exclude Griffin from testifying, the Court will exclude these improper portions

9. Indeed, in his deposition, when asked if he assumed that the position taken by Defendant in its answer was true for purposes of preparing his report, he responded, "Of course." (Doc. 125–6 at 20).

10. This is especially true given that the majority—if not all—of Griffin's legal statements and conclusions are incorrect. For example, Griffin asserts that age sub-group analysis is impermissible and that the only legally relevant age comparison is between those employees over and under the age of 40. However, the United States Court of Appeals for

the Sixth Circuit has concluded just the opposite. *Barnes*, 896 F.2d at 1466–67 ("An employer violates ADEA when preference is given to a younger employee even if the younger employee is within the protected class of persons age 40–and–over. ... We believe that the plaintiffs are correct when they assert that the [sub] age groups are relevant on their face. If employees younger than a specific plaintiff have a statistically significant lower discharge rate, then it is obvious that the statistics-absent another explanation for the discharge-are probative of discrimination.").

of Griffin's affidavit from consideration on summary judgment and at any trial of this matter, and Plaintiff's Motion (Doc. 110) will thus be **GRANTED IN PART** and **DENIED IN PART.**

### E. Defendant's Request to Exclude Tonowski's Rebuttal Report

■ After Griffin's report was filed, Tonowski offered a rebuttal report, in which he again opines that age was a statistically significant factor in Tepro's reclassification efforts and layoffs. (Doc. 103–2). In response to Griffin's criticism regarding age-seniority correlation based on date of hire, Tonowski calculates age-seniority correlation based on time in position, and opines that this analysis too demonstrates a correlated relationship between age and seniority. (*Id.* at 6). He also responds to numerous statements and opinions expressed in Griffin's affidavit, arguing that Griffin's views on the law and the facts of this case do not involve the application of statistical principles or methodology and thus do not undermine Tonowski's statistical analyses and opinions. (*Id.* at 6–9). In response to Griffin's argument that the only age group comparison that is meaningful in this ADEA action is that between employees over and under 40 years of age, Tonowski conducted an analysis of both the reclassification and the RIF based on these age groups. (*Id.* at 7–8). Tonowski notes that the conclusions in his expert report are not changed by these calculations, which he argues support his previous conclusions that age was a statistically significant factor in Tepro's reclassification and RIF. (*Id.* at 8).

Defendant has requested that the Court exclude Tonowski's rebuttal report because it "actually contains new opinions, rather than merely a rebuttal to Tepro's report," and because the report was provided after Tonowski's deposition and after the discovery deadline in this action had passed. (Doc. 103 at 2 n. 4). Plaintiff

argues that Tonowski's report is a proper rebuttal, that Tepro has failed to identify any "new opinions" contained in the supplemental report, and that it was timely filed pursuant to Fed.R.Civ.P. 26(a)(2)(D)(ii). (Doc. 108 at 8–10). Defendant did not address Tonowski's rebuttal report in its reply brief. (*See* Doc. 112).

■ "Federal Rule 26(a)(2)(B) requires parties to make mandatory disclosures about their experts." *Matilla v. S. Ky. Rural Elec. Co-op. Corp.,* 240 Fed.Appx. 35, 42 (6th Cir.2007). The Rule requires that a party's retained expert furnish a written report containing "a complete statement of all opinions to be expressed and the basis and reasons therefor." Fed. R.Civ.P. 26(a)(2)(B). In relevant part, Rule 26(a)(2), which governs expert disclosures, specifically provides a party with 30 days to disclose "evidence … intended solely to contradict or rebut evidence on the same subject matter identified by another party." Fed.R.Civ.P. 26(a)(2)(D)(ii). Indeed, the Sixth Circuit has noted that Rule 26 contemplates that an expert may "supplement, elaborate upon, [and] explain" his expert report. *Thompson v. Doane Pet Care Co.,* 470 F.3d 1201, 1203 (6th Cir.2006). However, "courts should not permit experts to testify as to a wholly new, previously unexpressed opinion." *In re Whirlpool Corp. Front–Loading Washer Prods. Liab. Litig.,* 45 F.Supp.3d 724, 760 (N.D.Ohio 2014) (internal citation and quotation marks omitted).

The Court finds in this case that Tonowski's rebuttal report does not include "wholly new, previously unexpressed opinions." Rather, his second report is a proper and timely rebuttal to Griffin's expert affidavit. Tonowski's rebuttal report was filed within 30 days from the date that Tepro disclosed Griffin's expert affidavit, which comports with Rule 26(a). Further, Tonowski does not express "new opinions" in his rebuttal report. Although he does

offer several new statistical analyses, he does so solely to rebut claims and arguments made by Griffin regarding the correct correlation or age comparison groups. Ultimately, he reaffirms the conclusions in his original report regarding the statistical significance of age in Tepro's reclassification and RIF efforts and merely argues that the analyses promoted by Griffin support, rather than undermine, those conclusions. Accordingly, the Court finds no reason to exclude Tonowski's rebuttal report.[11]

### F. Conclusion

The parties have primarily used these Motions in Limine as vehicles to set forth their own theories of the case and the facts supporting those theories. There is clearly no "junk science" at issue. That the opposing party believes that different data should have been used, additional factors considered, or alternate conclusions reached does not render contrary expert opinions irrelevant and unreliable. Instead, it reinforces the importance of

allowing both parties to present expert testimony, of allowing each party an opportunity to vigorously cross-examine the expert testimony offered by its opponent, and of allowing the finder of fact to weigh the credibility and opinions of both experts. In a case such as this one, the Court finds the extreme sanction of exclusion of expert testimony to be inappropriate. The Court concludes that the parties have not met their burden of persuading the Court that either expert must be excluded under the standards set forth in *Daubert* and its progeny. Accordingly, Defendant's Motion in Limine (Doc. 102) will be **DENIED,** and Plaintiff's Motion in Limine (Doc. 110) will be **DENIED IN PART** and **GRANTED IN PART,** as detailed above.

## II. MOTION FOR SUMMARY JUDGMENT

### A. Background

■ For the purposes of summary judgment, the Court will view the facts in the light most favorable to Plaintiffs.[12]

---

11. The Court notes, however, that given that the Court has restricted the scope of Griffin's expert testimony and has excluded portions of his expert affidavit, portions of Tonowski's rebuttal report may be rendered inadmissible or moot to the extent that they relate to the inadmissible portions of Griffin's testimony and report.

12. The party opposing summary judgment must "show that [he] can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary. Such evidence submitted in opposition to a motion for summary judgment must be admissible." *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir.2007) (citation and internal quotation marks omitted). Hearsay evidence, however, is inadmissible and "may not be considered on summary judgment." *See, e.g., Carter v. Univ. of Toledo*, 349 F.3d 269, 274 (6th Cir.2003); *see Back v. Nestle USA, Inc.*, 694 F.3d 571, 577 n. 1 (6th Cir.2012) (quoting

*United States v. Rodriguez–Lopez*, 565 F.3d 312, 314 (6th Cir.2009)) ("Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.").

Plaintiff has, in several instances relied upon hearsay (and double hearsay) statements in opposing Defendant's Motion for Summary Judgment. Specifically, Plaintiff relies upon emails from Debbie Faulkner, Tepro's Human Resources Manager, wherein Faulkner relays "ageist" statements allegedly made to her by other members of Tepro's management, including President Takashi Tanabe and Manufacturing Division Manager Jon Tate. Plaintiff also repeatedly references testimony from one of the claimants that there were "rumors" that older employees were being phased out. Such statements are clearly offered by Plaintiff for the truth of the matter asserted—that is, that Tepro's decisionmakers were motivated by age-based animus—and are clearly not made by the declarants themselves during

*See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Tepro is a manufacturer of rubber products for the automotive industry. (Doc. 94–2). Tepro's production process consists of two divisions: extrusion and finishing. (*Id.*). Finishing consists of cutting, deburring, molding, trimming, assembling, and packing. (*Id.*). Finishing employees were classified as "Tech II" or "Tech III" employees. Employees classified as Tech III were "responsible for the cutting, trimming, clipping, and packing of the final product." (*Id.* at 1–2). Tech II employees perform all of the same functions as Tech III employees, but they perform the additional function of molding. (*Id.* at 2). Molding is a "fundamental step" in Tepro's finishing process "and without it other production jobs ... would not exist." (*Id.* at 1). Molding is "more physically demanding and requires additional skill and training"; therefore, Tech II employees are paid $0.67 more per hour than Tech III employees. (*Id.* at 2).

Tepro's sales began to decline from 2006 to 2007 due to quality and production issues. (*Id.* at 2). In November 2007, Tepro's HR Division Manager, Debbie Faulkner, was asked to advise Tepro's President, Takashi Tanabe, and Vice President of Administration, Ples "Buck" Castle, how many employees age 60 and over were currently employed at Tepro.[13] (Doc. 105–3 at 5, 23). Faulkner advised Tanabe via email that Tepro had 34 employees aged 60 and above and that she had made a list of these employees. (*Id.*). Although Faulkner made a list detailing the names, dates of birth, and other information regarding these employees, she testified that Tanabe only asked for a number of employees; he did not ask her to create such a list, nor did he ask to see the list after she advised him that it had been created. (*Id.* at 5). In January 2008, Faulkner created another list of employees, listed by date of birth; she made a handwritten notation marking those employees currently over the age of 60 and another that stated "Stop! Those born in '48 will be 60 in 2008!" (*Id.* at 5, 24–26).

During 2008, Tepro's sales decreased more drastically as a result of the great recession, which caused car sales to decline, which in turn affected automobile manufacturers and suppliers. (Doc. 94–2 at 2–3; Doc. 94–19 at 6). Specifically, the car manufacturer Nissan, which constituted 80 percent of Tepro's business, experienced a reduction in sales, which caused a reduction in Tepro's own sales.[14] (Doc. 94–2 at 2–3; Doc. 94–19 at 4; Doc. 94–33 at 15).

As a result of Tepro's decreased sales, Tepro instituted various cost savings measures, including shutting down the caf-

testimony. Thus, these statements constitute hearsay, and the Court will not consider them on summary judgment.

It is possible that such statements may be admissible under an exception to the hearsay rule at trial; however, at this stage, Plaintiff has not demonstrated the applicability of any such exception. *See United States v. Arnold,* 486 F.3d 177, 206 (6th Cir.2007) (noting that "the burden of proving that the statement fits squarely within a hearsay exception rests with the proponent of the hearsay exception[.]") (citation and internal quotation marks omitted). Indeed, the Court notes that, although Tepro argued in its Reply brief that Plaintiff had relied heavily on hearsay statements, Plaintiff did not request leave to file a surreply in order to rebut such arguments. The Court simply will not scour the rules of evidence on Plaintiff's behalf to determine whether there is an exception that would render such hearsay statements admissible at the summary judgment stage.

**13.** It is undisputed that Castle is now deceased.

**14.** Plaintiff has conceded, solely for the purposes of summary judgment, that Tepro's sales decreased from 2006 to 2009.

eteria, changing the company's bonus structure, eliminating overtime, and reducing insurance benefits. (Doc. 94–2 at 3; Doc. 94–13 at 69, 74–76; Doc. 94–33 at 36). Salaried employees were also forced to take days off without pay. (Doc. 94–2 at 3; Doc. 94–13 at 73; Doc. 94–33 at 21, 35, 38–39).

These efforts, however, proved insufficient and Tepro determined that it needed to reduce its head count—that is, its number of employees. (Doc. 94–13 at 66, 70). First, Tepro reduced its number of temporary employees from over 100 to less than a dozen. (*Id.* at 72). After reducing temporary employees, Tepro began offering voluntary retirement and/or layoffs to its employees. Tepro's January and February 2008 Monthly Reports contained a "Profitability improvement (proposal)" for February and March, with certain goals under Faulkner's responsibility. (Doc. 105–6 at 3; Doc. 105–7 at 5). It included reduction of approximately 18 low-performing employees and reduction of approximately 12 "elderly direct employees (older than 60)," through proposed voluntary retirement. (*Id.*; Doc. 105–3 at 8). Indeed, in February 2008 Tepro began offering a voluntary retirement program to those employees age 60 and over.[15] (Doc. 105–3 at 7, 27–28). Tepro's monthly reports noted that, as of February 22, nine elderly employees had agreed to voluntary retirement under the program. (Doc. 105–

6 at 3; Doc. 105–7 at 5). According to Faulkner, approximately 40 people ultimately accepted voluntary layoff or retirement, including at least 10 employees under the age of 40. (Doc. 94–2 at 4).

In May 2008, Tanabe requested that Faulkner prepare an "EEO Job Group Analysis by Age." (Doc. 105–3 at 10, 29–32). This document shows, for each of calendar years 2006 through 2008, the age distribution of employees in particular positions within the company (i.e., during each year, how many of Tepro's technicians, engineers, executives, etc. were under 30 years old, between 30 and 40 years old, between 40 and 50 years old, between 50 and 60 years old, between 60 and 65 years old, and over 65 years of age).[16] (*Id.* at 29–32).

During 2008, Tepro's sales forecast continued to decline. (*See id.* at 9). In October 2008, Faulkner again advised all employees that Tepro was offering early voluntary retirement and voluntary layoffs before the company was forced to implement any mandatory layoffs.[17] (*Id.* at 33).

Tepro's employee handbook provides that "length of service is one of many factors which [it] consider[s] when making decisions regarding ... layoffs." (Doc. 94–13 at 156). The handbook provides the following definitions regarding length of service:

---

**15.** According to Faulkner, employees over the age of 65 had the most to gain from accepting voluntary retirement, as they would draw full retirement benefits plus unemployment benefits and paid vacation time. (Doc. 105–3 at 9). Faulkner felt that Tepro could "achieve better results if [she] first [met] individually with each of the twelve (12) (employees) who ha[d] reached full retirement age (65)" before posting the program more widely.[15] (*Id.* at 28). She was "hopeful" that "a portion of the remaining 34 eligible employees w[ould] be receptive to the offer." (*Id.*). However, she concedes in her deposition that she does not

recall conducting such individual meetings with employees over the age of 65, but did recall posting information about the program for all employees. (*Id.* at 9).

**16.** Temporary employees were not included in this analysis. (Doc. 105–3 at 10).

**17.** Employees accepting early retirement or voluntary layoff were offered to be paid for any vacation days remaining and for all holidays remaining in the 2008 calendar year. (Doc. 105–3 at 33).

Length of service at TEPRO is based on two factors: Your time since employment by TEPRO and you[r] time since assignment to a new job position.

. . . .

Upon completion of your introductory period (90 days), your length of service is the date that you first worked at TEPRO as a regular, full-time employee.

(*Id.*). The handbook also provides as follows:

In the unlikely event of a reduction in work force, normally those employees with the shortest term of employment will be affected first. The reorganization for the remaining positions will be in response to production requirements, overall company needs, and with regard for length of service in position so far as is practical.

If there is a need to make reductions in a particular work group . . ., the reduction may be made without regard to length of continuous service.

(*Id.* at 166).

Around this same time in late 2008, a Tech II employee complained to Faulkner that she knew that another employee was being paid the same hourly rate despite the fact that the other employee did not mold, while the complaining employee did mold. (Doc. 94–2 at 4). Faulkner investigated the complaint and determined that "many employees [were] receiving the Tech II molding pay who were not mold-

ing"; in essence, she discovered that some employees were actually Tech III employees because they did not mold but they were nonetheless being compensated as Tech II employees. (*Id.;* Doc. 94–13 at 98; Doc. 94–33 at 81–82). According to Faulkner, Tepro "did not want to pay employees for work they were not performing, particularly in the troubling economic climate." (Doc. 94–2 at 4).

After Faulkner discussed the situation with Manufacturing Division Manager Jon Tate, Tate determined that a form would be prepared and disseminated to all Tech II employees.[18] (*Id.;* Doc. 94–33 at 76–77, 81, 83–84). Specifically, the form provided Tech II employees two options: (1) the employee could choose to perform molding work and remain classified a Tech II employee at his or her current salary level or (2) he could choose to not perform molding work, being reclassified as a Tech III, and accept the salary reduction commensurate with that reclassification. (Doc. 94–33 at 78–79). According to Tate, Tech IIs who chose not to reclassify to Tech III positions would be required to train to mold, if they did not already know how to mold.[19] (*Id.* at 88–91). Tepro had not hired anyone into the Tech III position for a number of years before the reclassification began. (*See* Doc. 105–3 at 13; Doc. 105–4 at 2).

The forms were distributed in January 2009; the form was discussed with each employee, and Tate received numerous questions from employees.[20] (Doc. 94–33

**18.** Tate testified that he alone created the form and made the decision regarding the distribution of the forms and that no one else reviewed the form prior to its dissemination. (Doc. 94–33 at 89–90, 92).

**19.** Tate testified that the forms were actually distributed to all Tech II and Tech III employees, as they were also intended to identify any Tech III employees who wanted to learn to mold and move up to the Tech II position. (Doc. 94–33 at 76–84). He testified that sev-

eral people did, in fact, decide to move from Tech III to Tech II and were trained to mold. (*Id.* at 85–86).

**20.** Tate did not distribute the forms himself, but rather, had his subordinate managers and supervisors do so. (Doc. 94–33 at 94). The forms were returned to Faulkner upon completion by the employees, but Faulkner was not present for the discussions with the employees regarding the reclassification efforts. (Doc. 94–13 at 100–01).

at 83–85). Tate testified that the form itself discussed the decreased pay resulting from the reclassification, but he did not instruct his managers to discuss seniority with the finishing employees. He did, however, confirm that the managers and supervisors who distributed the forms to the finishing employees should have known that reclassification from Tech III to Tech II could cause some employees to lose their seniority.[21] (*Id.* at 101–02).

When Faulkner reviewed the forms, she found that 150 employees chose to be Tech II employees and perform molding functions. (Doc. 94–2 at 4–5). Of the 150 employees who chose to be Tech II, at least 102 were over the age of 40; all 48 employees under the age of 40 chose to be Tech II. (*Id.* at 4–5). Therefore, there were no Tech III employees under the age of 40 after the reclassification. Forms were returned for 29 employees—all over the age of 40—indicating a desire to "step down" into the Tech III classification so that they would not have to mold. (*Id.* at 4).

Included in this group were the claimants in the instant case, who, at the time, ranged in age from their early 40s to their mid-60s:

| Name | Date of Birth |
| --- | --- |
| Myrtle Breccia | July 18, 1957 |
| Harvey Brewer | December 17, 1944 |
| Karen Burch | May 14, 1961 |
| Charlotte Childress | September 25, 1945 |
| Kojeana Cole | May 20, 1956 |
| James Davis | September 5, 1945 |
| Maria Esparza | May 25, 1959 |
| Brenda Farries | October 21, 1954 |
| Jeana Gattis | July 6, 1962 |
| Sandra Kelley | August 7, 1953 |
| Tina Kennerly | October 4, 1961 |
| Vera Knox | August 15, 1954 |
| Kathleen Matthews | August 5, 1951 |
| James Miller | September 13, 1957 |
| Kay Mitchell | December 13, 1957 |
| Williams Parsons | April 20, 1943 |
| Debra Prance | March 20, 1966 |
| Doris Prince | January 5, 1948 |
| Lisa Pryor | March 27, 1962 |
| George Rogers | October 12, 1947 |
| Ida Stovall | July 2, 1950 |
| Anita Tate | January 20, 1950 |
| Rosa Tinoco | October 11, 1954 |
| JoAnn Wiley | September 24, 1955 |
| Ella Wilkerson | November 19, 1945 |

The parties dispute whether the claimants voluntarily accepted or chose reclassification. The majority of the claimants testified that they were not advised that that the reclassification would affect their seniority or length of service, and that, if they had known that reclassification would affect their seniority or subject them to a layoff, they would have chosen to mold instead of choosing to be reclassified. (*See* Docs. 105–5, 105–14 through 105–37). Only Stovall testified that she was told that those who chose not to mold would lose seniority. (Doc. 105–33 at 3). Kelley testified that she was specifically told that that her seniority would not be affected by the classification and that she would not be

---

**21.** Tate testified that "[s]eniority is understood. It's in the handbook. And our seniority is by classification .... such as Tech Level 1, if you asked to be promoted from a Tech 3 or a Tech 2 to go to Tech 1, then your seniority within the teach level starts when you go into that department.... Everything is handled within that tech level." (Doc. 94–33 at 94–97, 99–100).

laid off if she accepted reclassification; Kennerly testified that she was told that her job would not be in jeopardy if she became a Tech III employee. (Doc. 105–22 at 4; Doc. 105–23 at 5). Eleven of the claimants testified that they felt in some way pressured, forced, or manipulated into signing the form; however, in some of these instances, the claimants testified that they felt coerced or pressured into molding—that is, remaining Tech II employees—rather than feeling coerced or pressured to accept reclassification. (*See* Doc. 105–16 at 4; Doc. 105–17 at 3; Doc. 105–18 at 2–3; Doc. 105–21 at 10, 13; Doc. 105–22 at 6; Doc. 105–23 at 3–4; Doc. 105–26 at 1–2; Doc. 105–29 at 2; Doc. 105–31 at 5–6; Doc. 105–36 at 7; Doc. 105–37 at 3). However, numerous claimants testified that they made their own choice with respect to reclassification and that they were not encouraged, coerced, or threatened into reclassifying as a Tech III employee. (Docs. 105–15 at 3; Doc. 105–19 at 3; Doc. 105–20 at 3; Doc. 105–23 at 3; Doc. 105–28 at 2; Doc. 105–31 at 3; Doc. 105–34 at 3; Doc. 105–36 at 5).

Sometime in late 2008 or early 2009, Tepro determined that it would permanently layoff at least 30 employees by the end of March 2009; by early March, Tepro determined that it would be necessary to reduce its workforce by at least 40 employees.[22] (Doc. 105–9 at 2–3; Doc. 105–10 at 6; *see* Doc. 94–33 at 128–31). Tate testified that, while he was instructed to eliminate a certain number of employees by Castle, Tate himself made the ultimate decision of "what group we were going to pull from" to accomplish the workforce reduction. (Doc. 105–4 at 6). During this time, someone at Tepro created a spreadsheet of Tepro's Tech II and Tech III employees.[23] (Doc. 105–3 at 11–12, 35–44). This list included only the name, department, job classification, and age for each employee.[24]

Tate ultimately decided to reduce Tepro's Tech III workforce, based on seniority within the Tech III position because eliminating Tech III employees would cause the least hurt to the company as a whole. (*Id.* at 10–11, 13). Tate based the layoff decision on the employees' seniority within the Tech III classification.[25] (Doc. 94–33 at 54, 141, 143, 168–69).

In late March 2009, 16 of the current claimants—that is, Breccia, Cole, Esparza, Kennerly, Knox, Matthews, Mitchell, Parsons, Prance, Prince, Pryor, Rogers, Sto-

---

**22.** According to Faulkner, layoffs are the "last thing we want to do" as a cost savings measure. (Doc. 94–13 at 70). Tate testified that Tepro "never reached the number they wanted to go to" for layoffs. (Doc. 94–33 at 131).

**23.** Technically, the list included all of Tepro's employees, but the information for those employees who were not Tech II or Tech III was redacted. (Doc. 105–3 at 35–44).

**24.** In its Response in Opposition to Summary Judgment, Plaintiff represents that Faulkner created this spreadsheet. (Doc. 105 at 6). However, Faulkner expressly denied creating the spreadsheet in her testimony, and Plaintiff has pointed to no contrary evidence. (*See* Doc. 105–3 at 11–12). The record is thus unclear as to who made this spreadsheet and why it was compiled.

**25.** A March 13, 2009 email from Faulkner stated that the production manager and section managers making the layoff decisions were looking "not only ... at seniority, but skill and ability as well." (Doc. 105–10 at 2). As previously noted, Faulkner's emails constitute hearsay and are inadmissible on summary judgment. Nonetheless, Faulkner was not directly involved in the specific layoff decisions, and no other evidence in the record contradicts Tate's statement that only seniority within the Tech III position was considered in making the decisions of who would be affected by the reduction in force and that he alone determined who would be subject to the RIF.

vall, Tate, Tinoco, and Wiley—were called into small group meetings with Tate and Faulkner to be informed that they were being laid off because Tepro needed to reduce its workforce; Wilkerson was terminated several weeks later. (Doc. 105–2; Doc. 105–4 at 7, 13; *see* Doc. 105–3 at 17–18). The employees were "shocked" and at least one employee became angry and called Tate a "liar." (Doc. 105–4 at 13; Doc. 105–3 at 17–18).

Another round of layoffs took place in late June 2009, wherein Brewer, Burch, Childress, Davis, Farris, Gattis, and Kelley were terminated. (Doc. 105–2; Doc. 105–4 at 8). Tate does not recall how the decision to do a second round of layoffs was made, but stated that the reason was the same as the March layoffs—that that sales continued to decline—and confirmed that he was again the person who selected who would be subject to the reduction. (Doc. 105–4 at 8–11). He again selected Tech III employees, for the same reason he selected them for the March layoffs— namely, that he believed that eliminating these employees would cause the least amount of harm to the company as a whole. (*Id.* at 10–13). According to Faulkner, Miller was supposed to be a part of the June 2009 layoffs, but "due to a clerical error, he was not." (Doc. 105–13; Doc. 94–2). Because he had less seniority than other employees who were laid off in June 2009, Faulkner terminated Miller when she discovered the error in January 2010.[26] (*Id.*). According to Faulkner, Miller acknowledged that he should have been laid off sooner. (*Id.*).

In total, 35 Tech III employees were laid off, with 3 additional Tech III employ-ees electing voluntary layoff or retirement. (Doc. 94–2 at 6). Tepro retained five Tech III employees, who ranged in age from 45 to 62 years old. (*Id.*). According the Faulkner, laying off Tech III employees "by date of employment [rather than seniority within classification] would not have made a difference," and the 35 Tech III employees laid off in March and June 2009 would still have been laid off.[27] (Doc. 94–2 at 8).

A total of nine charges of discrimination were filed against Tepro with the EEOC in late 2009 and early 2010, including those by Burch, Brewer, and Miller. (Doc. 94–2 at 7). Robert Trail was assigned to investigate the charges on behalf of the EEOC, and EEOC attorney Mark Chen was also involved in the witness interviews. (*Id.*). In late 2010, the EEOC issued determination letters indicating that there was reasonable cause to believe that the charges against Tepro were true. (*Id.*).

The EEOC then issued conciliation agreements on behalf of 55 former Tepro employees; this group included Castle (who, by then was the *former* Vice President of Tepro), hourly production employees, those who took voluntary retirement or layoff, those subject to the RIF and those who were terminated for performance reasons; a separate conciliation agreement was submitted for Miller. (*Id.* at 7). The EEOC's total demand exceeded 5 million dollars, and it requested a response from Tepro within 7 days. (*Id.*). According to Faulkner, Tepro asked to meet with the EEOC because she "did not understand the class the EEOC was addressing." (*Id.*). However, the EEOC de-

---

**26.** Plaintiff's "Claimant Chart" erroneously notes that Miller was terminated on June 10, 2010. (Doc. 105–2). However, both its brief and Miller's separation notice correctly note that he was terminated on January 29, 2010. (Doc. 105 at 7; Doc. 105–13).

**27.** Faulkner did not, however, aver that the specific employees who were laid off would have still been subject to a seniority based layoff if they had not been reclassified to Tech III status.

nied the request for a meeting, and the Tepro received notice on September 24, 2010 that conciliation had failed; Tepro later received a separate conciliation failure notice as to Miller. (*Id.*). The EEOC then instituted the instant lawsuit on November 15, 2012. (Doc. 1).

## B. Summary Judgment Standard

Federal Rule of Civil Procedure 56 instructs the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A party asserting the presence or absence of genuine issues of material facts must support its position either by "citing to particular parts of materials in the record," including depositions, documents, affidavits or declarations, stipulations, or other materials, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1). As previously noted, when ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir.2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may discharge this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or simply "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. Where the movant has satisfied this burden, the nonmoving party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir.2009) (citing *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348; Fed.R.Civ.P. 56). The nonmoving party must present sufficient probative evidence supporting its claim that disputes over material facts remain and must be resolved by a judge or jury at trial. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)); *see also White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475–76 (6th Cir.2010). A mere scintilla of evidence is not enough; there must be evidence from which a jury could reasonably find in favor of the nonmoving party. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *Moldowan*, 578 F.3d at 374. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

## C. Analysis

Under the Age Discrimination in Employment Act ("ADEA"), employers are prohibited from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). A plaintiff may establish a violation of the ADEA by offering either direct or circumstantial evidence. *Blizzard v. Marion Tech. College*, 698 F.3d 275, 283 (6th Cir.2012). "The

ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Schoonmaker v. Spartan Graphics Leasing, LLC,* 595 F.3d 261, 264 (6th Cir.2010) (citation and internal quotation marks omitted).

Defendant has moved for summary judgment as to Plaintiff's ADEA claims. (Doc. 93). Defendant argues that: (1) Plaintiff has no direct evidence of discrimination; (2) Plaintiff cannot meet its burden of establishing a *prima facie* case of discrimination under the *McDonnell Douglas* analysis because it did not show that Tepro treated similarly situated younger employees more favorably or that age was the "but for" reason for the termination of the class employees; and (3) even if Plaintiff can demonstrate a *prima facie* case, it cannot establish that Defendant's legitimate nondiscriminatory reason for the layoffs were pretext for age discrimination.[28] (Doc. 94 at 23–34). Defendant further argues that several individual class members should be dismissed because they either were not subject to the RIF or because their testimony demonstrates that age was not the "but for" reason for their termination. (*Id.* at 34–35). Finally, Defendant presents two affirmative defenses, arguing (1) that Plaintiff's action is barred by the doctrine of laches, and (2) that Plaintiff's claims should be dismissed because it failed to conciliate the claims in good faith. (*Id.* at 35–38).

In Response to Defendant's Motion, Plaintiff has alleged that it has both direct and circumstantial evidence supporting its ADEA claims. (Doc. 105 at 20–36). It further argues that genuine issues of material fact remain as to whether Tepro's layoffs were a pretext for unlawful age discrimination. (*Id.* at 36–46). Plaintiff also argues that Tepro's arguments regarding the individual class members and its affirmative defenses are wholly lacking in merit. (*Id.* at 46–52).

The Court will address Plaintiff's argument that it has presented direct evidence of discrimination, and will then review Plaintiff's claim under the *McDonnell Douglas* framework. Finally, the Court will address Defendant's arguments in support of its affirmative defenses.

### 1. Direct Evidence

Plaintiff argues that it has presented direct evidence of age discrimination. Specifically, Plaintiff points to the following statements as "direct evidence" that the identified class of employees was unlawfully terminated based on their age: (1) an October 2008 email from Faulkner relaying Tanabe's complaints about having to keep "the older, less productive" employees over temporary employees, and Faulkner's response that the company had a policy in place to deal with employees with low production and work quality problems; (2) an April 2009 email from Faulkner stating that employees were being rotated for weekly layoffs because Tate "sa[id] he can not [sic] meet shipments if we lay off the least senior employees (length of service) and work the ones with the most tenure (they are the older employees and slow producers)"; and (3) isolated remarks by Tate that certain older employees should consider retirement.

■■■ To prevail at the summary judgment stage on a claim based on direct evidence, "plaintiffs must prove by a preponderance of the evidence that age was the 'but-for' cause of the challenged employer decision." *Sharp v. Aker Plant Servs. Grp.,* 726 F.3d 789, 798 (6th Cir. 2013). "[D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was moti-

---

**28.** *See McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

vated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir.2003); *see also Reed v. Am. Cellular, Inc.*, 39 F.Supp.3d 951, 961 (M.D.Tenn. 2014) ("Direct evidence of discrimination is evidence from the lips of the defendant proclaiming his or her … animus.") (citation and internal quotation marks omitted); *Scott v. Potter*, 182 Fed.Appx. 521, 526 (6th Cir.2006) (noting that only "the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age" will constitute direct evidence of discrimination); *DiCarlo v. Potter*, 358 F.3d 408, 416 (6th Cir.2004) ("[D]irect evidence generally cannot be based on isolated and ambiguous remarks[.]"), (overruled on other grounds as recognized by *Scheick v. Tecumseh Pub. Schs.*, 766 F.3d 523, 530 (6th Cir.2014)); *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir.2004) ("Direct evidence is evidence that proves the existence of a fact without requiring any inferences."). Examples of direct evidence include "a facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees in the protected group[.]" *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.2000).

Here, the Court finds the statements identified by Plaintiff are far from "direct," given the complex factual background that gave rise to Tepro's RIF. Additionally, these comments are not directly related to Tepro's Tech II and Tech III reclassification efforts or its ultimate decision regarding who would be subject to the RIF. Because these comments are not directly related to the decisions that led to the adverse employment actions against this class of employees, the Court necessarily has to draw inferential steps in order to determine that the age of these employees was the reason that those decisions were made. *See Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 477–78 (6th Cir.2002) (noting

that, in age discrimination cases, courts must consider whether the alleged statements showing bias "were related to the decision-making process"). Furthermore, these statements relate to Tepro's efforts to *avoid* a reduction in force, rather than any efforts to effectuate permanent layoffs, and thus cannot constitute direct evidence that the eventual permanent layoffs were made with discriminatory intent. Stated another way, this evidence does not *require* the conclusion that Defendant unlawfully utilized its RIF to terminate employees based on an age-based animus. *See Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir.2010).

Moreover, as previously discussed, all of Plaintiff's alleged "direct" evidence of discrimination constitutes hearsay. "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *Back v. Nestle USA, Inc.*, 694 F.3d 571, 577 n. 1 (6th Cir.2012) (quoting *United States v. Rodriguez–Lopez*, 565 F.3d 312, 314 (6th Cir.2009)). "Hearsay evidence may not be considered on summary judgment." *See, e.g., Carter v. Univ. of Toledo*, 349 F.3d 269, 274 (6th Cir.2003). Here, the statements allegedly portraying an age bias by decisionmakers Tate and Tanabe were relayed by Faulkner in emails to third parties or described by others in deposition testimony. Plaintiff relies upon these statements to prove that Tepro intentionally targeted older employees for reclassification and layoffs because of an age-based bias. Because Plaintiff has offered these statements as proof of the truth of the matter asserted—namely, that Tepro engaged in a pattern of age discrimination—they constitute hearsay, and the Court clearly cannot rely upon them as direct evidence of systemic age discrimination in considering the merits of Defendant's Motion for Summary Judgment. Thus, in this case, the Court finds that Plaintiff has

failed to present any direct evidence of discrimination.

### 2. Circumstantial & Statistical Evidence

 The Court instead considers all of Plaintiff's evidence to be circumstantial in nature, and it will accordingly analyze Plaintiff's age-discrimination claims under the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Blizzard,* 698 F.3d at 283; *Schoonmaker,* 595 F.3d at 264 n. 2; *Scott,* 160 F.3d at 1126. Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of age discrimination under the ADEA by proffering evidence that: (1) he or she is between 40 and 65 years' old; (2) he or she was qualified for his particular position; (3) he or she was subjected to an adverse employment action; and (4) in a reduction in force case, such as this one, he or she must also *offer additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled plaintiff out for discharge for impermissible reasons, such as his or her age.* *See, e.g., Pierson v. Quad/Graphics Printing Corp.,* 749 F.3d 530, 536–37 (6th Cir.2014); *Tuttle v. Metro. Gov't of Nashville,* 474 F.3d 307, 317 (6th Cir.2007); *Scott,* 160 F.3d at 1126 (noting that the typical fourth prong of the *prima facie* case—that the employee was replaced by someone outside the protected class or that similarly situated employees outside the protected class were treated more favorably—is supplanted in workforce reduction cases); *Cooley v. Carmike Cinemas, Inc.,* 25 F.3d 1325, 1329 (6th Cir.1994). "The burden of proof at the *prima facie* stage is minimal." *Seeger v. Cincinnati Bell Tel. Co., LLC,* 681 F.3d 274, 283 (6th Cir.2012) (quoting *Dixon v. Gonzales,* 481 F.3d 324, 333 (6th Cir. 2007)); *Watson v. Ft. Worth Bank & Trust,* 487 U.S. 977, 986, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988) (noting in a dispa-

rate treatment case that "[t]he burden of proving a *prima facie* case is not onerous") (internal quotation marks omitted).

The parties do not dispute that Plaintiff can establish the first three prongs of its *prima facie* case. Additionally, the Court has already found that Plaintiff lacks any direct evidence of discrimination. Accordingly, in order to meet its minimal burden to establish its *prima facie* case, Plaintiff must set forth sufficient circumstantial and/or statistical evidence indicating that Tepro singled out the aggrieved employees for termination based on their age.

 If the plaintiff is successful in doing so, the defendant must then offer a legitimate, nondiscriminatory reason that motivated the adverse employment action. *Schoonmaker,* 595 F.3d at 264. Once the defendant has provided a legitimate non-discriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reason for the adverse action was pretextual.

 To establish pretext in relation to a plaintiff's termination, the plaintiff must show that: (1) the defendant's reasons for terminating the plaintiff "had no basis in fact"; (2) the stated reasons "did not actually motivate [the plaintiff]'s discharge"; or (3) the defendant's proffered reasons "were insufficient to motivate [the plaintiff's] discharge." *Segel v. Kimberly–Clark Corp.,* 473 Fed.Appx. 416, 420 (6th Cir.2012) (citing *Manzer v. Diamond Shamrock,* 29 F.3d 1078, 1084 (6th Cir. 1994)). "A reason cannot be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Seeger,* 681 F.3d at 285; *see also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 519, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("it is not enough ... to disbelieve the employer; the fact finder must believe the plaintiff's explanation of intentional discrimination.");

*Blizzard,* 698 F.3d at 283 ("The burden of persuasion is on the plaintiff to show that "age was the 'but-for' cause of the employer's adverse action." "). "A plaintiff's *prima facie* case, together with evidence showing the employer's proffered reason is false, permits the jury to infer the ultimate fact of intentional discrimination." *Moffat v. Wal–Mart Stores, Inc.,* 620 Fed.Appx. 453, 349, 2015 WL 4880135, at *6 (6th Cir. Aug. 17, 2015); *Fife v. Vicksburg Healthcare, LLC,* 945 F.Supp.2d 721, 735 (S.D.Miss.2013) (finding that the plaintiff's *prima facie evidence,* "combined with sufficient proof that the employer's proffered justification is false, may permit the trier of fact to determine that the employment decision was motivated by discrimination.") (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). "However, there will also be cases where no reasonable jury could conclude that the employment action was discriminatory in nature, notwithstanding the plaintiff's showing of a prima facie case and sufficient evidence to negate the defendant's justification." *Fife,* 945 F.Supp.2d at 735 (citing *Reeves,* 530 U.S. at 148, 120 S.Ct. 2097). If plaintiff fails to meet his burden of production to show that the proffered reason was pretext, then defendant is entitled to summary judgment. *See Jordan v. Kohl's Dep't Stores, Inc.,* 490 Fed.Appx. 738, 742 (6th Cir.2012) (noting that the plaintiff "always bears the burden of producing sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him. An employer's explanation cannot be rejected unless there is a sufficient basis *in the evidence* for doing so.") (internal citations omitted, emphasis original).

In this case, the Court finds that Plaintiff has met its minimal burden at the *prima facie* stage. First, the statistical evidence, taken in a light most favorable to Plaintiff on summary judgment, raises genuine issues of material fact as to whether the 25 class members were targeted for layoff because of their age. Specifically, Plaintiff's statistical evidence, in the form of Dr. Tonowski's expert analyses and opinions, suggests that older employees were overrepresented at a statistically significant level in both the reclassification efforts and the reduction in force. Tonowski also opined that the average age of Tepro's workforce decreased after its RIF, which does not conform to the expectations for the results of an RIF based on seniority. Tonowski concluded that these statistical results had less than 1 in 10,000 chance of being the result of random chance. "Statistical data showing significant disparities in an employer's pattern of conduct toward a protected class as a group can create an inference that a defendant discriminated against individual members of the class"; here, Tonowski's expert analyses and opinions show such disparities, and thus raise such an inference at the summary judgment stage. *See Barnes,* 896 F.2d at 1466.

Plaintiff has also presented circumstantial evidence that supports its minimal burden at the *prima facie* stage. Specifically, the following facts constitute circumstantial evidence that Tepro may have targeted the class members based on their age: (1) Tepro's focus on employees ages in the numerous lists that were made focusing on age or date of birth in the 15 months leading up to the reclassification and RIF; [29] (2) the fact that Tepro did not

---

**29.** Plaintiff's circumstantial evidence is strongest with regard to the eight class members over the age of 60—that is, Brewer,

Childress, Davis, Mitchell, Parsons, Prince, Rogers, and Wilkerson—given that specific lists were made of employees over the age of

advise the class members that their seniority would be affected by their decision to reclassify to Tech III status, and in some cases, specifically advised the class members that they would not be subject to any future layoffs; (3) the temporal proximity between the reclassification efforts and the RIF; (4) the testimony from certain class members that they felt pressured to accept reclassification; and (5) the fact that no employees younger than 40 were reclassified to Tech III status or subjected to the RIF. Considered as a whole and construed in Plaintiff's favor, Plaintiff's statistical and circumstantial evidence are sufficient for the Court to conclude that Plaintiff has met its *prima facie* burden of demonstrating that genuine issues of material fact exist as to whether Tepro targeted the 25 class members for the RIF on the basis of age.

■ Because Plaintiff has established its *prima facie* case, the burden shifts to Defendant to set forth a legitimate non-discriminatory reason for its actions. Here, Defendant has proffered such a reason—namely, that a workforce reduction was necessary due to Tepro's financial position and that Tech III employees with the shortest length of service in that position were chosen for layoff pursuant to the terms of Tepro's employee handbook and because terminating employees from that position would have the least impact on the company's overall operations.

Because Defendant has offered a legitimate non-discriminatory reason for the termination of the class members, the burden shifts once again to Plaintiff to demonstrate that Defendant's reason was pretext for discrimination. As previously noted, a plaintiff cannot demonstrate pretext unless it shows "both that the reason was false, and that discrimination was the real rea-

son." *Seeger*, 681 F.3d at 285. Thus, while statistical and general circumstantial evidence may be sufficient for a plaintiff to overcome its relatively slight *prima facie* burden, the burden of demonstrating pretext is a higher one. In this case, the Court finds the pretext inquiry to be a much closer question than that of whether Plaintiff established its *prima facie* case of discrimination.

■ Much of the evidence weighs against a finding of pretext. First, the undisputed facts confirm that Tepro was in financial distress, that it took numerous cost saving measures that were ultimately unsuccessful, and that a reduction in force was necessary for the company's financial survival. *See Acree v. Tyson Bearing Co., Inc.*, 128 Fed.Appx. 419, 431 (6th Cir.2005) (finding that plaintiffs failed to meet their burden as to pretext as to ADEA disparate treatment claim because they did not show that defendant's "cost-savings justification had no basis in fact, was not the actual reason motivating the decision ... that its reason was insufficient to justify the decision, [or that its] stated reasons ... were false."). Additionally, although Plaintiff makes much of the fact that there was no official written plan governing the layoffs, Plaintiff has not presented any evidence to refute Tepro's evidence that laying off Tech III employees would have the least impact on the company as a whole given that these employees performed less skilled tasks that could also be performed by Tech II employees. And, although Plaintiff makes much of the lists that were made in the months and years preceding the reclassification and layoffs which provided employees' ages and dates of birth, there is no evidence that Tate—the ultimate decisionmaker—relied upon, much

---

60 and that Tepro expressed a goal to reduce the number of "elderly" employees, specifi-

cally defining elderly as over the age of 60.

less ever saw, such lists while determining which employees would be subject to the RIF.[30]

Furthermore, all Tech II and Tech III employees were asked to sign the reclassification forms in early 2009, regardless of age or length of service. Only two employees—Kelley and Kennerly—testified that they were told that they would not be subject to a layoff if they accepted Tech III status. While several of the class members testified that they felt some sort of pressure or coercion to sign the reclassification form, even those that did express of a feeling of manipulation did not uniformly report feeling pressured to accept the Tech III classification, rather than simply feeling pressured to sign the form; indeed, several testified that they felt pressured *not* to reclassify as Tech III employees.

Moreover, Plaintiff has failed to present any evidence from Tech II or Tech III employees outside of the Plaintiff class regarding their conversations with management regarding reclassification. For example, Plaintiff failed to present any evidence that employees under the age of 40 were not similarly pressured or coerced into signing the reclassification form, were told about the potential implications to seniority associated with their decision, or were told that they would or would not be subject to a potential reduction in force in the future based on their decision. Plaintiff also failed to present similar evidence with respect to the over 100 employees *over* the age of 40 that chose to, and did, remain Tech II employees after the reclassification. Plaintiff has thus failed to demonstrate that these employees were treated differently than younger employees or than similarly situated employees within the protected age group who were not laid off. Stated another way, Plaintiff has failed to present any evidence that links any perceived pressure or misrepresentations by the members of the Plaintiff class to any age-based animus or incentives on behalf of Tepro's decisionmakers.

Additionally, several Tech III employees were not laid off pursuant to the RIF, and their ages ranged from 43 to 62 years. Plaintiff offers no evidence that would explain why Tepro would specifically target a group of 25 employees, ranging in age from 43 to 65, based on their age, while demonstrating no such age based animus to other Tech III employees in the same age range.[31] That is, Plaintiff has failed to offer any explanation as to why, for example, if Tepro was motivated by age based animus in making its layoff determinations, it would choose to layoff five Tech III employees under the age of 50 while retaining two Tech III employees over the age of 60, or why, for example it would target these 25 employees for reclassification based on age while not targeting over 100 other employees in the same age group. *See Widoe v. Dist. #111 Otoe Cnty. Sch.*, 147 F.3d 726, 731 (8th Cir.1998) (noting that a genuine issue of material fact may not exist as to pretext "because the evidence was *inconsistent with* a reasonable inference of the type of discrimination being alleged.").

However, Plaintiff has submitted some evidence that supports its pretext argu-

---

30. There is also no evidence that Castle or Tanabe saw these lists.

31. This is especially true given that Tepro's stated goal for its RIF was to lay off 40 employees, but it ultimately laid off only 35 employees. If Plaintiff's theory of the case is correct and Tepro was in fact corralling older employees into the Tech III classification in order to effect discriminatory terminations under the guise of a valid RIF, it is logical to assume that Tepro simply would have eliminated *all* Tech III employees in order to meet its target RIF number and terminate as many older employees as possible.

ment. The Court notes that, in order to accept Plaintiff's argument regarding pretext, it must view the reclassification and RIF as a single continuous action by Tepro that was designed with the goal of moving older employees into positions that could then easily be eliminated. Plaintiff's *prima facie* case included statistical evidence suggesting that older employees were overrepresented in the reclassification and RIF decisions at statistically significant levels, and circumstantial evidence regarding Tepro's focus on its employees' ages in the months and years leading up to the decisions in question. Additionally, the timing of the layoffs of Tech III employees immediately upon the heels of a large scale effort to reclassify employees into that position is suspicious, as is and the fact that the reclassifications were made around the same time that a reduction in force was being contemplated.

In addition to this *prima facie* evidence, Plaintiff has presented evidence suggesting that Tepro's reason for choosing the specific class of employees for layoff was false by calling into question whether Tepro followed its own written policy for determining seniority or length of service for a reduction in force and has presented testimony from several of the claimants that they were lied to about losing their seniority.[32] The Court finds that genuine issues of material fact remain as to whether Tepro appropriately followed the layoff policy set forth in its employee handbook, which stated that "normally those employees with the shortest term of employment will be affected first." If Tepro did not follow its reduction in force policy in laying

off those employees within the Tech III classification, who were all over the age of 40, the fact finder could infer that Tepro did so to target the class members because of their age.

Although the Court notes its own doubts as to the strength of Plaintiff's pretextual evidence, the Court cannot weigh the evidence or determine any factual or credibility issues on summary judgment. Thus, construing all inferences in Plaintiff's favor, as the Court must do at this stage, the Court finds that Plaintiff has presented sufficient evidence upon which a reasonable juror could find that Tepro intentionally discriminated against the class members on the basis of age. As the Court previously noted, the pretext analysis in this case represents a close call, and close calls on summary judgment should be resolved in favor of the nonmovant. *See Rogers v. First Union Nat'l Bank*, 259 F.Supp.2d 200, 206–207 (D.Conn.2003) (noting that where the evidence of pretext represents a "close call," it is "not appropriate for the Court to makes these ultimate determinations ... on a paper record."). Finding that Plaintiff has met its burden of production and has established that genuine issues of material fact remain as to whether Tepro's stated reasons for subjecting the 25 class members to an RIF, the Court concludes that it must **DENY** Defendant's Motion for Summary Judgment. (Doc. 93).

### 3. Affirmative Defenses

#### a. Doctrine of Laches

Tepro next argues that Plaintiff's claims are barred by the doctrine of laches.

---

**32.** The Court notes that a plain language review of the employee handbook and length of service policy suggests that the policy was at best ambiguous, and at worst, internally inconsistent. The Court thus has serious doubts regarding the weight that should be given to the handbook language in assessing the merits of Plaintiff's claims. However, the parties have presented conflicting testimony regarding their own interpretations and understandings of the handbook language, and because this is the summary judgment stage, the Court cannot weigh the evidence or assess the credibility of witnesses and must draw all inferences in Plaintiff's favor.

(Doc. 94 at 35–35). Specifically, Tepro argues that Plaintiff unreasonably delayed in pursuing its claim because "[t]wo years and two months passed between the date the EEOC ended ·conciliation (September 24, 2010) and the filing of this Complaint," and that the EEOC can offer no reasonable justification for the delay. (*Id.* at 33–34). Tepro further argues that it was prejudiced by the delay because key witnesses—including Castle, Tanabe, and Trail—are no longer available because (1) they have died or left the country or (2) they have limited to no recollection of the events surrounding Plaintiff's claims. (*Id.* at 34). Additionally, Tepro argues that it has been prejudiced by the substantial increase to the potential back pay award to the claimants. (*Id.* at 34–35).

 "Laches is the "negligent and unintentional failure to protect one's rights." " *EEOC v. Watkins Motor Lines, Inc.,* 463 F.3d 436, 439 (6th Cir.2006) (quoting *Nartron Corp. v. STMicroelectronics,* 305 F.3d 397, 408 (6th Cir.2002)). The party raising this affirmative defense bears the burden of proving both of its two elements: "(1) unreasonable delay in asserting one's rights; and (2) a resulting prejudice to the defending party." *Id.* at 439–40 (quoting *Brown–Graves Co. v. Cent. States, Se. & Sw. Areas Pension Fund,* 206 F.3d 680, 684 (6th Cir.2000)).

 Here, the Court finds that Defendant has failed to meet its burden of demonstrating that it is entitled to summary judgment based on the doctrine of laches. First, the Court notes that, on the record before it, it cannot determine the exact length of Plaintiff's delay in filing suit. The pertinent delay in cases such as this— that is, where conciliation efforts are required of the EEOC—is the time elapsed between the end of the EEOC's conciliation efforts and the filing of the suit.[33] *Id.* at 439. Here, the parties·dispute the date that the conciliation efforts ended, with Tepro contending that such efforts ended on September 24, 2010, and with the EEOC maintaining that such efforts did not end until December 23, 2010. This action was commenced on November 15, 2012. · This disputed fact alone makes clear that the Court must deny Defendant's request for summary judgment, as Tepro's version of facts makes the delay over two years whereas the EEOC's version of facts demonstrates a delay of just under two years. The Court cannot·appropriately assess the reasonableness of any delay if factual issues remain as to the exact length of the delay.

 Nonetheless, the Court finds that Defendant has also failed to prove the requisite prejudice from any delay. In order to prove the prejudice element for a laches defense, the proponent must establish that it suffered "a disadvantage in asserting or establishing a claimed right, or some other harm caused by detrimental reliance on the plaintiff's conduct." *EEOC v. Lockheed Martin Global Telecomm.,* 514 F.Supp.2d 797, 803 (D.Md.2007) (citing *White v. Daniel,* 909 F.2d 99, 102 (4th Cir.1990)). Examples of such undue prejudice may "include unavailability of witnesses, changed personnel, and the loss of pertinent records." *Id.* (citation omitted). However, in order to prevail on the defense, the defendant must "prove that any lost evidence would ultimately support its position." *Id.* (citing *Tobacco Workers Int'l Union, Local 317 v. Lorillard Corp.,* 448 F.2d 949, 958 (4th Cir.1971)). "Ultimately, the Court must determine whether the

---

**33.** Tepro's reliance upon *Finnerty v. RadioShack Corp.,* 390 Fed.Appx. 520 (6th Cir.2010) is misplaced, as that case did not involve the EEOC and involved no conciliation require-ment, and therefore applied a different legal standard regarding the time measurement for the element of "unreasonable delay." *See id.* at 524.

defendant has been crippled in its ability to succeed on the merits at trial." *Id.* at 803–04 (citation and internal quotation marks omitted).

Here, while Tepro has pointed to the loss of several witnesses through death or relocation, it has failed to offer any argument that those witnesses would have provided evidence in support of its case.[34] Additionally, although Tepro cites to the faded memory of one EEOC investigator, Tepro was still able to depose that investigator, and again, has failed to argue that the gaps in his testimony due to his memory would have supported Tepro's theory of the case. The Court finds that the evidence in this case is well developed on both sides and that Tepro has made no showing that Plaintiff's decision not to commence this action until November 2012 in any way crippled Tepro's ability to succeed on the merits of this action at trial.

Finally, Tepro argues that the fact that the "back pay meter [w]as running" during the two-year delay has exposed Tepro to a greater risk of pecuniary loss, which is prejudicial. The Court finds that it cannot determine whether the additional back pay that was accruing is sufficiently prejudicial without first determining whether the EEOC's delay was unreasonable, and, as the Court previously noted, genuine issues of material fact exist that preclude the Court from making such a determination. Regardless, the Court may address the issue of back pay at a later time, using "its equitable power to locate a just result in light of the circumstances peculiar to the case if the EEOC ultimately prevails on the merits." *See Lockheed Martin,* 514 F.Supp.2d at 805 (citing *Occidental Life Ins. Co. v. EEOC,* 432 U.S. 355, 373, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977)). Ac-

cordingly, the Court finds that Tepro has not met its burden of proof as to the prejudice element of the defense of laches, and its Motion for Summary Judgment on that basis is accordingly **DENIED.**

### b. Good Faith Conciliation

Finally, Tepro argues that summary judgment should be granted because the EEOC failed to conciliate in good faith. (Doc. 94 at 35–36 n. 21). Tepro concedes that the Sixth Circuit has "direct[ed] courts to limit their analysis to whether the EEOC made an attempt at conciliation, leaving the form and substance of those conciliations as within the discretion of the EEOC[.]" (*Id.*). However, it asks the Court to follow the Second, Fifth, and Eleventh Circuits, which have held that district courts may make a more detailed inquiry in whether the EEOC's offer was made in good faith. (*Id.*). Tepro argues that the facts show a lack of good faith in this case, specifically noting: (1) that the conciliation class "looks nothing like the class currently at issue in this litigation," as it contained employees from a variety of positions, who left the company for a variety of reasons; (2) the EEOC's demand for the same amount of money for each person regardless of circumstances; (3) the fact that the EEOC gave Tepro very little time to respond and refused Tepro's request to meet to discuss the proposal; and (4) the fact that the EEOC deemed conciliation failed without giving Tepro the benefit of ever responding to the proposal or expressly stating that it did not want to conciliate. (*Id.*).

The Sixth Circuit has held that the EEOC must make a good faith effort to conciliate a claim before bringing a lawsuit in court. *EEOC v. Keco Industries,*

---

34. The EEOC also correctly notes that Castle did not die until almost a year *after* this action was commenced; thus, any prejudice caused to Tepro by not having his testimony through deposition or affidavit cannot rightfully be deemed a harm caused by detrimental reliance on Plaintiff's conduct.

*Inc.,* 748 F.2d 1097, 1102 (6th Cir.1984). However, as Defendant correctly notes, the Sixth Circuit has held that the form and substance of such efforts are "beyond judicial review," as they are solely within the discretion of the EEOC and has further held that the "district court should only determine whether the EEOC made an attempt at conciliation." *Id.* at 1102.

In her August 14, 2014 Order in this case, Magistrate Judge Susan K. Lee rejected Defendant's arguments supporting its request for discovery regarding the EEOC's investigation and conciliation efforts. *EEOC v. Tepro, Inc.,* 38 F.Supp.3d 883 (E.D.Tenn.2014). In her Order, Magistrate Judge Lee specifically noted that "*Keco,* while not a recent case, is still good law and was recently cited favorably by the Sixth Circuit. *See Serrano v. Cintas Corp.,* 699 F.3d 884, 904–05 (6th Cir. 2012).... *Keco* remains binding on this Court as controlling law in this circuit." *Id.* at 888–89.

The Court notes its agreement with Magistrate Judge Lee's analysis. There is no dispute that Plaintiff did, in fact, attempt conciliation in this case; accordingly, based on *Keco,* the Court must reject Defendant's argument that Plaintiff's action be dismissed for failure to engage in good faith conciliation efforts. Defendant's Motion for Summary Judgment (Doc. 93) will thus be **DENIED** on this ground.

### III. MOTION FOR SANCTIONS

Defendant has also filed a Motion for Sanctions against Plaintiff, arguing that the EEOC and its attorneys violated Rule 11 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1927 by filing this action with "unsupported claims and allegations of age discrimination" and by refusing to dismiss the lawsuit "after the individual class members' own deposition testimony refuted the EEOC's factual allegations and claims." (Docs. 95–96). The Court has now reviewed the parties' arguments and evidence, and has determined that genuine issues of material fact remain and that this case must proceed to trial. Clearly, if Plaintiff's evidence was sufficient to survive summary judgment, Plaintiff's case was not so unsupported as to warrant Rule 11 sanctions for its filing or for Plaintiff's refusal to voluntarily dismiss the action. In light of the Court's conclusion that Defendant's Motion for Summary Judgment must be denied, the Court also finds that its Motion for Sanctions (Doc. 95) must also be **DENIED.**

### IV. CONCLUSION

Accordingly, and for all the reasons discussed herein:

- Defendant's Motion in Limine to Preclude the Expert Testimony of Dr. Richard Tonowski (Doc. 102) is hereby **DENIED;**

- Plaintiff's Motion in Limine to Preclude the Expert Report and Opinion Testimony of Dr. David Griffin (Doc. 110) is hereby **DENIED IN PART** and **GRANTED IN PART;**

- Defendant's Motion for Summary Judgment (Doc. 93) is hereby **DENIED;**

- Defendant's Motion for Sanctions (Doc. 95) is hereby **DENIED;**

- Plaintiff's claims will **PROCEED TO TRIAL.** The Court will separately enter an amended scheduling order which will govern the remainder of this action.